**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF KANSAS**

CYNTHIA BRADY,

       Plaintiff,

       v.

MIDLAND CREDIT MANAGEMENT,
INC.,

       Defendant.

Case No. 24-2110-JAR-RES

**PLAINTIFF'S MOTION FOR SUMMARY**
**JUDGMENT AND MEMORANDUM IN SUPPORT THEREOF**

Plaintiff, Cynthia Brady ("Brady") hereby moves this Court for summary judgment, pursuant to Fed.R.Civ.P. Rule 56 and L.R. 56-1, and in support thereof, states:

**INTRODUCTION**

This is a story of a woman named Brady: Cynthia Brady, who sometimes goes by Cindy for short. During her deposition, Ms. Brady said she commonly goes by "Cindy Brady, like [in] the Brady Bunch. Makes it easy for people to remember.", see, attached Exhibit A, the transcript of the November 19, 2024 Deposition of Cynthia Brady at 15:2-5). For legal things, however, such as credit card applications, she typically uses "Cynthia Brady", see, Exhibit A at 60:23-61:7.1.

On January 11, 2024, with the assistance of her lawyer, Ms. Brady disputed three debts that Defendant Midland Credit Management, Inc. ("MCM") had negatively reported on her Experian credit report, via three separate letters, one regarding each disputed debt, see, Dkt. 1-2.

---

1. Cindy is a common and well-known diminutive for Cynthia, just like Robert/Bob, Margeret/Peggy, Richard/Dick, Bernadette/Bernie, or Amanda/Mandy, the list goes on.

These letters included her full name, Cynthia Kay Brady, her address, the dollar amount of each debt as it appeared on her credit report, and the name of the original creditor, see, Id. For two of the debts at issue, Ms. Brady's dispute letters contained the last four digits of the MCM account numbers, see, Id. at pp. 3, 5.

Several months later, on March 1, 2024, Ms. Brady found that MCM had continued to negatively credit report all three debts of these debts but had failed to note that any of them had been disputed, despite Ms. Brady's written notices, which MCM admits it received, see, Dkt. 1-3; see also, SMF at ¶36, infra. As such, MCM violated §1692e(8) of the Fair Debt Collection Practices Act ("FDCPA"), which prohibits false statements made in connection with the collection of a debt, including prohibiting communicating any "credit information which is known or which should be known to be false, including the failure to communicate that a disputed debt is disputed", see, 15 U.S.C. § 1692e(8).[2] This violation harmed Ms. Brady's credit reputation, her ability to obtain credit, and it cost Ms. Brady additional time, money, and effort because she was forced to have an attorney send a letter to re-assert her right to have her credit report accurately reflect that she had disputed this debt (see, Dkt. 1-4).

Ms. Brady has since learned, through discovery in this matter, that MCM changed her name from "Cynthia" to "Cindy" when it obtained the third debt it was reporting on her credit report, see, attached Exhibit B, the transcript of the November 12, 2024 Deposition of MCM's Fed.R.Civ.P. Rule 30(b)(6) Witness, Bernadette Canez, 29:16-30:10; 31:10-32:5. When accounts are merged like this, MCM's system allegedly loses its ability to locate an account by searching

---

2. See also, Ewing v. Med-1 Solutions, 24 F.4th 1146 at 1153-54 (7th Cir. 2022); Evans v. Portfolio Recovery Associates, 889 F.3d 337, 346 (7th Cir. 2018); Sayles v. Advanced Recovery Systems, 865 F.3d 246, 249-250 (5th Cir. 2017); and Brady v. Credit Recovery, 160 F.3d 64, 65 (1st Cir. 1998).

for the name "Cynthia", even though MCM had both "Cynthia" and "Cindy" on the account, and had been sending collection letters to Ms. Brady under both names. MCM possesses several systems that would help its employees find an account with a diminutive first name – especially where so much other account information was identical (such as the full address, creditor name, and amount of the debt) but it does not require that *any* of these systems actually be used.

MCM has offered its own conjecture as to why the accounts were not located, including the specious claims that the Cindy/Cynthia difference prevented its employees from finding the accounts, and/or that the dispute letters spell out the word "Terrace" rather than "Ter.", or even, perhaps, that the dispute letters include the dollar amount (but not cents) for each of the disputed debts, see, SMF at ¶ 43, infra. None of these farcical "discrepancies" in Ms. Brady's consumer dispute letters could have possibly prevented MCM's employees from locating Ms. Brady's three accounts; not if MCM maintained processes designed to prevent errors in locating accounts. Defendant's whimsical conjecture is insufficient to meet the burden of a bona fide error defense, as required by §1692k(c) of the FDCPA, see, 15 U.S.C. §1692k(c). Ms. Brady is entitled to summary judgment as to her claim.

## STATEMENT OF MATERIAL FACTS NOT IN DISPUTE

### I.  Stipulated Facts[3]

1.  Cynthia Brady ("Brady" or "Plaintiff") is a citizen of the State of Kansas.

2.  Midland Credit Management, Inc. ("MCM") is a Kansas corporation.

3.  For purposes of this case only, Brady and MCM have stipulated that MCM is a "debt collector" as defined by 15 U.S.C. § 1692a(6) based on Plaintiff's representation that the

---

3. See, Pre-Trial Order, Dkt. 34 at ¶2(a).

obligations at issue in this case were incurred by Plaintiff primarily for personal, family, or household purposes pursuant to 15 U.S.C. § 1692a(5).

4.      MCM owns three defaulted debts belonging to Plaintiff, and those debts were a charged off Comenity Capital Bank account and two charged off Synchrony Bank accounts (collectively referred to as "the Debts").

5.      Sometime after the Debts went into default, were charged off by Comenity and Synchrony, respectively, and were subsequently acquired by MCM, MCM began credit reporting on the Debts.

6.      The allegedly violative credit reporting at issue occurred after January 11, 2024, and ceased on or about March 28, 2024.

**II.      Plaintiff's Statement Of Material Facts**

**A.      MCM's Acquisition, Collection, And Credit Reporting Of The Debts.**

7.      On or around June 29, 2021, Defendant MCM loaded into its system a portfolio of defaulted debts it had purchased which contained two debts allegedly owed by Ms. Brady originally to Synchrony Bank, one to Belk (a retailer), and another to Home Shopping Network (HSN), <u>see</u>, Exhibit <u>B</u>, 22:6-25:4.

8.      The information from the original creditor, Synchrony, included Ms. Brady's full address, the last four digits of her Social Security Number, and her date of birth, <u>see</u>, Exhibit <u>A</u>, 25:5-24.

9.      The Synchrony/HSN account was loaded into MCM's system with the name "Cynthia Brady", <u>see</u>, Exhibit <u>B</u>, 27:16-18.

10.      The Synchrony/Belk account was loaded into MCM's system with the name "Cindy Brady", <u>see</u>, Exhibit <u>B</u>, 27:1-6.

11.     These two accounts were automatically merged under the name "Cynthia Brady", due to the matching information in the account, <u>see</u>, Exhibit <u>B</u>, 27:3-28:19; 36:2-37:11.

12.     Thereafter, on July 3, 2021 and August 21, 2021, MCM sent collection letters regarding each of the two Synchrony debts to Ms. Brady under the name "Cynthia Brady", <u>see</u>, attached Group Exhibit <u>C</u>.

13.     Subsequently, on October 22, 2021, Defendant MCM loaded into its system a portfolio of defaulted debts it had purchased which included a defaulted debt allegedly owed by Ms. Brady originally to Comenity, <u>see</u>, Exhibit <u>B</u>, 28:23-30:13; 89:20-90:4.

14.     When the Comenity account was loaded, the "Customer ID" MCM had established for the two Synchrony accounts under the name "Cynthia Brady" was merged with the new "Customer ID" created under the name "Cindy Brady", <u>see</u>, Exhibit <u>B</u>, 28:23-30:13; 35:10-23; 89:20-90:4.

15.     After this merger, the name "Cynthia" was no longer listed in the primary account information for any of Ms. Brady's three accounts and, if an MCM employee searched for the name "Cynthia" within its system, no results would have been returned, <u>see</u>, Exhibit <u>B</u>, 31:10-32:5.

16.     Subsequently, MCM sent Ms. Brady eight collection letters for the Debts, mailed between October 25, 2021 and January 24, 2022 all addressed to "Cindy Brady", <u>see</u>, Group Exhibit <u>D</u>.

17.     MCM also began attempting to collect the Debts from Ms. Brady via negatively credit reporting each of the Debts with a status of 93, which indicates "active collections", which it began doing in October, 2021 for the Synchrony accounts, and in February, 2022 for the Comenity account, <u>see</u>, Exhibit <u>B</u>, 55:19-57:12; <u>see also</u>, Dkt. 1-3.

**B.    Ms. Brady's Disputes Of The Comenity And Synchrony Debts**

18.    On January 11, 2024, with the assistance of her attorney, Ms. Brady disputed, in writing, in three letters sent via U.S. mail, three debts which MCM was reporting on her credit report: a debt owed originally to Comenity Bank, and two owed originally to Synchrony Bank, see, Dkt. 1-2; see also, Exhibit A, 55:6-10, 24-25, 92:13-15.

19.    These dispute letters contained: Ms. Brady's full name, "Cynthia Kay Brady"; her full address; the dollar amount of the debts (as MCM reported on her Experian credit report); and the names of the original creditors, Synchrony Bank (for two of the Debts), and Comenity Capital Bank (for one of the Debts), see, Dkt. 1-2 at pp. 1, 3, and 5; see also, Dkt. 1-3 at pp. 2-3.

20.    Due to a scrivener's error, the letter disputing the alleged Comenity Capital debt contained an incorrect last four digits of an MCM account number, see, Dkt. 1-2 at p. 1; see also, Ex. A at 105:1-16.

21.    The two letters disputing the Synchrony debts contained the last four digits of the MCM account number for each debt, as they each appeared on Ms. Brady's credit report, see, Dkt. 1-2 at pp. 3, 5; Dkt. 1-3, attached as Exhibit E with the last four digits of the MCM account numbers unredacted; see, Exhibit A, 103:1-104:17,  Exhibit B, 24:12-16, 22-25.

22.    The letters each contained the following statement:

"I dispute this debt and do not want to be contacted about it by your company. I am not requesting validation."

See, Dkt. 1-2, at pp. 1, 3, and 5.

23.    On March 1, 2024, with the assistance of her attorney, Ms. Brady obtained a copy of her Experian credit report, see, Dkt. 1-3; see also, Exhibit A, 62:19-21, 90:18-23.

24.    The March 1, 2024 Experian credit report showed that MCM continued to negatively report the Debts, that MCM updated its credit reporting of the Debts on February 24,

2024, and that MCM failed to note that any of the Debts had been disputed by Ms. Brady, <u>see</u>, Dkt. 1-3; <u>see also</u>, Exhibit <u>A</u>, 92:19-94:9.

25.     As a result of MCM's continued credit reporting, and failure to note her dispute of the Debts, Ms. Brady had to take the time, effort, and expense to have her attorney send a second letter disputing the Debts (the "Lawyer Dispute Letter"), which he did on March 22, 2024, <u>see</u>, Dkt. 1-4; <u>see also</u>, Exhibit <u>A</u>, at 92:7 – 94:9.

26.     MCM's continued credit reporting and its failure to note that the debts were disputed when it continued to report and update the reporting of the alleged Synchrony and Comenity debts on Ms. Brady's Experian credit reports harmed her credit reputation, impaired her credit rating and her ability to obtain credit, <u>see</u>, <u>Evans</u>, 889 F.3d at 345, 349 ("[T]he failure to inform a credit reporting agency that the debtor disputed his or her debt will *always* have influence on the debtor, as this information will be used to determine the debtor's credit score.")(internal quotations omitted). Ms. Brady testified that she experienced stress as a result of MCM's failure to report her disputes, which manifested itself through inability to sleep, loss of appetite, as well as migraines, <u>see</u>, Exhibit <u>A</u>, at 69:22 to 70:16.

### C.     MCM's Processes For Handling Consumer Dispute Letters

27.     According to MCM's protocol for locating and matching accounts with consumer correspondence that "does not include a valid MCM account number", such as Ms. Brady's dispute letters here, the Start of Day team in India was required to search for matching information in her letters and its system, including all information provided in the correspondence:

> "Use all the information provided in the correspondence like consumer's name, Social Security Number (SSN) full or partial, address, original account number, phone number, etc., to look for the consumer."

See, Exhibit G, filed under seal, MCM's SOD Account Search Guidelines, at DEF 0038; see also, Exhibit B, 40:25-41:22.

28.      If the MCM employee in India attempting to locate an account is unable to locate an account using this information, MCM's guidelines permit, but do not require, its employees to use a wildcard to search for variations on a consumer's first name, last name, or address, see, Exhibit B, 49:14-24.

29.      If the MCM employee in India is unable to locate an account after performing the above, MCM's procedures state that they are to search a separate database, Salesforce, to locate the consumer by name, see, Exhibit G, at DEF 0038.

30.      If the MCM employee in India is unable to match the account still after searching Salesforce, they are to: "Look for any possible matches with any other additional information, such as the name and balance of the original creditor.", see, Exhibit G, at DEF054.

31.      If an account is located, but additional confirmation is required, MCM employees may, but are not required to, use a tool called "Credit Browser", which can be used to confirm a partial address or name, or confirm a consumer's full name based on address alone, see, Exhibit B, 51:17-52:16, Exhibit G, at DEF055.

32.      If unable to locate an account still, having completed the steps outlined in ¶¶ 27-31, supra., MCM's processes require that three separate MCM employees search for the account for three consecutive days, followed by a final attempt on a seventh working day by another employee, see, Exhibit B, 48:15-49:13.

33.      MCM's procedures for letters for which it is unable to locate an account after four employees have searched for the account, over the course of seven days after it is received, requires that the letter file is saved to a folder titled "UFA" (Unable to Find Account) and named

as follows: "[Current File Name]_[UFA]_AMName1_AMName2, AMName3_AMName 4.", <u>see</u>, Exhibit <u>G</u>, at DEF054.

34.     MCM has no evidence that its employees used wildcard searches in processing Ms. Brady's three dispute letters, <u>see</u>, Exhibit <u>B</u>, 71:18-72:1.

35.     MCM has no evidence that its employees used Credit Browser to attempt to match an account to Ms. Brady's three dispute letters, <u>see</u>, Exhibit <u>B</u>, 51:14-16.

**D.     MCM's Receipt And Handling Of Ms. Brady's Dispute Letters**

36.     MCM received Ms. Brady's three dispute letters and, on January 23, 2024, they were scanned and time/date stamped by MCM's mailroom employees, <u>see</u>, attached Exhibit <u>B</u>, 46:20-25, 82:1-83:19; <u>see also</u>, attached Exhibit <u>C</u>, MCM's Document Production Bates No.s DEF0465-0470.

37.     According to MCM's procedures, after the letters were received and scanned into MCM's system by the mailroom employees, they were delivered, electronically, to the "Start of Day" team, located in India, <u>see</u>, Exhibit <u>B</u>, 40:20-24.

38.     Between January 24, 2024 and January 30, 2024, following the processes outlined in ¶¶ 29-33 <u>supra.</u>, six different MCM employees in India attempted to, but, apparently, could not successfully match any of Ms. Brady's three dispute letters to her account, <u>see</u>, attached Exhibit <u>H</u>, September 12, 2024 email from MCM's attorney, Shilee Mullin, to Ms. Brady's attorney, David J. Philipps.

39.     More specifically, MCM's file naming protocols for saving letters for which its employees were unable to find an account indicate that, on January 24, 25, 26, and 30, each of the three dispute letters was reviewed and saved by the following six MCM employees:

| Dispute Letter | 1/24/24 | 1/25/24 | 1/26/24 | 1/30/24 |
|---|---|---|---|---|
| **Comenity** | MCM Employee 1 | MCM Employee 2 | MCM Employee 3 | MCM Employee 4 |
| **Synchrony 4853** | MCM Employee 5 | MCM Employee 6 | MCM Employee 3 | MCM Employee 4 |
| **Synchrony 5056** | MCM Employee 3 | MCM Employee 1 | MCM Employee 6 | MCM Employee 5 |

See, Exhibit H.[4]

40.     The file names for each of the three letters began with "NA_FACTACT_CND", which indicates that, at some point, an MCM employee who saved the letter understood that it was a consumer dispute and cease contacts demand, see, attached Exhibit I, filed under seal, (MCM's Indexing Guidelines, DEF0068); see also, Exhibit H.

41.     MCM has produced no business records which would indicate what steps, if any, were followed by its employees in reviewing and handling the dispute letters at issue, nor how long each one of them spent attempting to locate the accounts.

42.     Defendant MCM has no testimony from any of the six employees in India as to their review of and/or attempts to locate the accounts associated with Ms. Brady's January 11, 2024 dispute letters, and has stipulated that their testimony will not be used to support any of MCM's defenses in this lawsuit.

43.     MCM's 30(b)(6) deponent, Ms. Canez, offered three possible explanations that MCM's employees were unable to match Ms. Brady's dispute letters to any of the three debts it was credit reporting: 1) the primary name on the account in MCM's system was "Cindy Brady",

4. At the request of Defendant MCM, the names of the six MCM employees located in India have been redacted and replaced with "MCM Employee 1-6".

rather than "Cynthia Brady" (see, SMF ¶¶ 11-15, supra), 2) the street name in the dispute letters was spelled out "Terrace", whereas its system had abbreviated it as "Ter." (see, Exhibit B 42:21-45:13), 3) the dispute letters listed the dollar amounts, but not the cents, for each disputed debt (see, Exhibit B, 46:2-7), even though MCM acknowledged that the credit report did not include cents (see, Exhibit B, 57:8-10), and 4) one of the debts included an incorrect MCM account number (see, Exhibit B, 47:25-48:14).

44.     Aside from saving the three letters into the "UFA" folder, no employee at MCM took any other action to notify Ms. Brady that its employees were unable to locate her accounts, see, Exhibit B, 51:14-51:7; Exhibit D, 106:2-10.

45.     As a result of MCM's failure to locate Ms. Brady's three accounts, it continued to report the Debts to Experian and updated that reporting in February, 2024 while failing to note that the Debts had been disputed by Ms. Brady, see, Dkt. 1-3; Exhibit E.

46.     On March 29, 2024, MCM's employee, MCM India Employee 3 [5], reviewed and processed Ms. Brady's Lawyer Dispute Letter (Dkt. 1-4), located all the three of the Debts at issue, and noted Ms. Brady's dispute and attorney representation, see, Exhibit B, 59:20-61:16.

**ARGUMENT**

Summary judgment should be granted if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law, see, Celotex Corp. v. Catrett, 477 U.S. 317, 322-23, 106 S.Ct. 2548, 91L.Ed.2d 265 (1986); Family Trust v. State Farm Fire & Casualty, 688 F. App'x 551, 552 (10th Cir. 2017); Gerard Tank & Steel v. Airgas USA, 2018 U.S. Dist. LEXIS 110541 at [*2](D. Kan. 2018)

_____

5. MCM India Employee 3 is the only MCM employee who had also reviewed all three of Ms. Brady's January 11, 2024 dispute letters, see, ¶ 39, supra.

(Robinson, J.); see also, Fed.R. Civ.P. Rule 56. Once the moving party meets this burden, the

non-movant must come forward with specific facts supported by affidavits or other appropriate

evidence establishing a genuine issue for trial, see, Matsushita Elec. Indus. Co. v. Zenith Radio

Corp., 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986).

The non-moving party may not rest upon mere allegations in the pleadings or upon

conclusory statements in affidavits; rather, the nonmovant must go beyond the pleadings to

support his or her contentions with properly admissible evidence, see, Celotex, 477 U.S. at 322-

323. "The mere existence of a scintilla of evidence in support of the nonmoving party's position

will be insufficient to survive a summary judgment motion; there must be evidence on which

the jury could reasonably find in favor of the nonmoving party.", see, New Mexico Oncology &

Hematology Consultants v. Presbyterian Healthcare Services, 994 F.3d 1166, 1172 (10th Cir.

2021), citing, Anderson v. Liberty Lobby,  477 U.S. 242, 252 (1986).

**I.      MCM's Continued Credit Reporting, While Failing To Note Ms. Brady's Disputes, Violated §1692e(8) Of The FDCPA.**

Section 1692e of the FDCPA prohibits the use of any false, deceptive or misleading

statements in connection with the collection of any debt, including:

> Communicating or threatening to communicate to any person credit information which is known or which should be known to be false, **including the failure to communicate that a disputed debt is disputed**.

See, 15 U.S.C. §1692e(8)(emphasis added).

Indeed, every Circuit Court of Appeals that has ruled on this issue has found that failure

to report that a disputed debt is disputed is unequivocally a violation of § 1692e(8) of the

FDCPA, see, Ewing v. Med-1 Solutions, LLC, 24 F.4th 1146, 1153-54 (7th Cir. 2022); Evans v.

Portfolio Recovery Associates, 889 F.3d 337, 346 (7th Cir. 2018); Sayles v. Advanced Recovery

Systems, 865 F.3d 246, 249-250 (5th Cir. 2017); and Brady v. Credit Recovery, 160 F.3d 64, 65

(1st Cir. 1998).

Here, undeniably, MCM received Ms. Brady's three dispute letters (SMF at ¶ 36), understood them to be consumer disputes (SMF at ¶ 40), but continued to report the debts on Ms. Brady's Experian credit report, while failing to note that the debts had been disputed (SMF at ¶ 24). The only conclusion that can be drawn from these facts is that MCM violated §1692e(8) of the FDCPA.

## II.     Ms. Brady Has Article III Standing For Her Claim Pursuant to §1692e(8) Of The FDCPA.

MCM has asserted that Ms. Brady cannot establish Article III standing for her claim, see, Dkt. 34 at p. 1, ¶ 1.a. Article III of the Constitution requires a plaintiff have standing to sue, meaning she has experienced (1) "an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision.", see, Spokeo v. Robins, 578 U.S. 330, 338 (2016). An injury-in-fact requires that a plaintiff has suffered "'an invasion of a legally protected interest' that is 'concrete and particularized' and 'actual or imminent, not conjectural or hypothetical'", see, Lupia v. Medicredit, 8 F.4th 1184, 1190 (10th Cir. 2021), citing, Spokeo, 578 U.S. at 339. A concrete injury may be tangible or intangible, see, Lupia, 8 F.4th at 1191 ("Though concreteness may be more easily satisfied for tangible injuries like physical or monetary harms, intangible injuries…may nevertheless be concrete for standing purposes.").

### A.     Ms. Brady Experienced Concrete Intangible Injuries As Result Of MCM's Violation of §1692e(8) Of The FDCPA.

Both history and the judgment of Congress should be used to determine whether an intangible injury is sufficiently concrete to rise to the level of an injury-in-fact, see, Lupia, 8 F.4th at 1191. In Lupia, the Tenth Circuit found that if the intangible harm alleged was similar to a type of harm that could be prosecuted as a traditional common law tort, history

dictates that such an intangible harm is an injury-in-fact, analogizing a debt collector calling a plaintiff to collect a disputed debt -- in violation of §1692c(c) of the FDCPA -- to the common law tort of intrusion upon seclusion, see, Id.

Indeed, the Tenth Circuit has also held that 1692e(8) of the FDCPA "is rooted in the basic fraud law principle that, if a debt collector *elects* to communicate credit information about a consumer, it must not omit a piece of information that . . . the consumer has disputed a particular debt.", see, Dotson v. AWA Collections, 2023 U.S. App. LEXIS 9729, at [*9](10th Cir. 2023)[6], citing, Llewellyn v. Allstate Home Loans, 711 F.3d 1173, 1189 (10th Cir. 2013), and Wilhelm v. Credico, 519 F.3d 416 (8th Cir. 2008).

In Ewing, 24 F.4th at 1153, the Seventh Circuit, in its analysis of whether a nearly identical violation of §1692e(8) was sufficient for Article III standing, found that Congress's intention of eliminating abusive debt collection practices, and not competitively-disadvantaging law abiding collectors, supported the consumer's standing:

> The statutory violation in these cases is clear—the Debt Collectors failed to report a dispute that they should have known about. And Congress specifically authorized the Consumers' claims for redress. 15 U.S.C. § 1692e(8). Congress created that claim, along with other enumerated claims, to counter abusive debt-collection practices and to ensure that upstanding debt collectors are not at a competitive disadvantage.

See, Ewing, 24 F.4th at 1153, citing, 15 U.S.C. §1692(e).

As is relevant here, the Seventh Circuit in Ewing focused not only on the defamatory nature of the continued credit reporting, but the publication of that credit reporting. More

---

6. Dotson involved whether consumers' alleged claims pursuant to §1692e(8) were assignable and concluded, because they are closely related to common law fraud, Oklahoma state law common law did not permit the claim to be assigned, see, Dotson, 2023 U.S. App. LEXIS 9729, at [*10].

specifically, whether the credit reporting agency understood the significance of the negative credit reporting:

> To determine whether there has been a publication here, then, we ask whether TransUnion understood the defamatory significance of the Debt Collectors' reports. We believe that it did. TransUnion included the debts in the Consumers' credit reports; TransUnion would have included the disputes too had the Debt Collectors communicated them. And the Consumers submitted evidence that TransUnion's assessment of their creditworthiness took into account whether a debt was disputed or not. That is enough to show that TransUnion understood the significance of the reports. The Consumers suffered an intangible, reputational injury that is sufficiently concrete for purposes of Article III standing.

See, Ewing, 24 F.4th at 1154.

As the Seventh Circuit explained in Evans, 889 F.3d at 349, violations of §1692e(8) of the FDCPA impact the daily lives of consumers against whom they are committed even if a potential creditor has not performed a hard credit check, raising a red flag to one's existing creditors, negatively impacting a consumer's purchasing power through limiting the credit opportunities made available to a consumer, and impacting a consumer's credit ratings:

> An inaccurate credit report produces a variety of negative effects. For instance, it is a red flag to the debtor's other [existing] creditors and anyone who runs a background or credit check, including landlords and employers.
>
> * * *
>
> Put simply, the failure to inform a credit reporting agency that the debtor disputed his or her debt will *always* have influence on the debtor, as this information will be used to determine the debtor's credit score.

See, Evans, 889 F.3d at 345, 349 (internal quotations omitted).

Here, MCM's continued credit reporting of the Debts on Ms. Brady's Experian credit report and its failure to note that the debts were disputed when it continued to report and update the reporting of the alleged Synchrony and Comenity debts, caused intangible injuries which are rooted in common law fraud/defamation: MCM's continued credit reporting without noting Ms. Brady's dispute harmed her credit reputation (including that with both prospective and existing

creditors), impaired her credit rating, and her ability to obtain credit. (SMF at ¶¶ 23, 24, and 26).

Moreover, MCM unequivocally received Ms. Brady's disputes, and understood that they were disputes, as was made clear by the way its employees saved her letters within their system to indicate a consumer dispute (SMF at ¶ 40). MCM's continued credit reporting of the Debts to Experian with the status code "93", which MCM testified indicates "active collections", was understood by Experian and, as such, was sufficient for publication. (SMF at ¶17), see, Ewing, 24 F.4th at 1154. Ms. Brady's reputational damage, stemming from MCM's failure to report her disputes, is undeniably concrete and establishes a clear injury-in-fact for Article III standing.

**B.    Ms. Brady Experienced Concrete Tangible Injuries As  Result Of MCM's Violation of §1692e(8) Of The FDCPA.**

MCM's collection actions also caused Ms. Brady to act to her detriment, by spending additional time, money, and effort in order to have her attorney send a letter to MCM to re-assert her right to have her credit report accurately reflect that she had disputed these debts by sending an additional letter to MCM. (SMF at ¶¶ 25). Ms. Brady's time, effort and/or expense were necessary to re-assert her rights under the FDCPA, see, SMF at ¶ 32. This is sufficient to establish a concrete and tangible injury-in-fact which is sufficient for Article III standing, see, Walters v. Fast AC, 60 F.4th 642, 649 (11th Cir. 2023)(". . . evidence of lost time, money and peace" are "garden-variety injuries in fact" sufficient for Article III standing); and Mack v. Resurgent Capital Services, 70 F.4th 395, 406-407 (7th Cir. 2023) (time, effort and/or money spent re-asserting one's FDCPA rights demonstrate an injury-in-fact); see also, In re: Mack, 2024 U.S. App. LEXIS 28658 at [*1](7th Cir. 2024)(affirming that time and energy spent needlessly re-asserting rights pursuant to the FDCPA, are also sufficient for Article III standing, even without evidence of a financial injury).

Had MCM reported Ms. Brady's disputes of the Debts after it received and understood

the January 11, 2024 dispute letters, as it was commanded to do by Congress's enactment of §1692e(8) of the FDCPA, she would have no tangible injuries.[7] The time and effort, as well as expense that Ms. Brady had to undertake in re-disputing the Debts (SMF ¶ 25) is also a tangible, concrete injury. Ms. Brady has Article III standing to pursue her claims based on both her tangible and intangible concrete injuries.

**III.     MCM's Violation Of The FDCPA Was Not A <u>Bona</u> <u>Fide</u> Error.**

MCM has asserted, as its Second Affirmative Defense, that MCM acted in good faith with reasonable grounds to believe that its actions were not in violation of law, including the FDCPA, and the actions were unintentional and/or were the result of a <u>bona</u> <u>fide</u> error as defined in the FDCPA, <u>see</u>, Dkt. 6 at p. 3.

In order for a debt collector to avail itself of the FDCPA's <u>bona</u> <u>fide</u> error defense, the debt collector must show, by a preponderance of the evidence that:

(1) "the violation was not intentional";
(2) that the violation "resulted from a bona fide error"; and
(3) that the violation occurred despite "the maintenance of procedures reasonably adapted to avoid any such error."

---

7. Indeed, Congress's intent in not competitively-disadvantaging law-abiding collectors is particularly relevant to the facts here. MCM *knew* it had received three dispute letters from "Cynthia Brady", and it *knew* nothing would become of the three letters once they were terminally placed into the "UFA" folder, which is apparently is MCM's black hole, abyss, or holding cell for consumer correspondence that MCM employees in India have been unable to process after one week, <u>see</u>, SMF at ¶¶33, 43. Meanwhile, other law-abiding collectors have policies which require their employees to respond to similar letters, using the address in the letter or on the return envelope, to explain that no account was located, and to ask for additional information, <u>see</u>, <u>e.g.</u>, <u>Volkert v. National Credit Systems</u>, 2024 U.S. Dist. LEXIS 219289 at [*3](C.D. Ill. 2024). MCM – which describes itself as "one of the largest debt collection companies in the United States" (<u>see</u>, https://midlandfunding.com/midland-credit-management/, last accessed January 3, 2025) – is competitively advantaged by not responding to letters for which its employees cannot match an account, such as Ms. Brady's letters here.

Lupia, 8 F.4th at 1194, <u>citing</u>, 15 U.S.C. § 1692k(c); <u>see also</u>, <u>Johnson v. Riddle</u>, 443 F.3d 723,

728 (10th Cir. 2006); <u>Evans</u>, 889 F.3d at 349, <u>citing</u>, <u>Jerman, v. Carlisle, McNellie, Rini, Kramer</u>

<u>& Ulrich LPA</u>, 559 U.S. 573,  587, 130 S.Ct. 1605, 176 L.Ed.2d 519 (2010); <u>see also</u>, <u>Ewing</u>, 24

F.4th at 1154. As is the case with all affirmative defenses, the collector asserting this defense has

the burden of proof as to each element, <u>see</u>, <u>Johnson</u>, 443 F.3d at 728. As the Tenth Circuit held

in <u>Lupia</u>, a collector asserting this defense has the burden to set forth "specific facts"

demonstrating a genuine issue for trial as to this defense, <u>see</u>, <u>Lupia</u>, 8 F.4th at 1195.

In <u>Sherman v. Sheffield Financial</u>, 338 F.R.D. 247, 253 (D. Minn. 2021), the district

court explained that fact witness testimony is a necessary component for a defense involving the

processing of a consumer dispute:

> The present motion involves the fact depositions of the [Automated Consumer
> Dispute Verification] ACDV Agents directly involved in the investigations of
> Plaintiff's disputes which are at the heart of Plaintiff's claims. Due to their
> personal involvement in those investigations, the ACDV Agents clearly possess
> information that is relevant to the present case. Moreover, although information
> regarding Defendant's policies may be obtained through a 30(b)(6) deposition or
> other discovery, only the ACDV Agents themselves can attest to their own
> training, actions, and experiences in reference to those policies, and whether they
> actually adhered to those policies while investigating Plaintiff's disputes.

<u>See</u>, <u>Sherman</u>, 338 F.R.D. at 253 (compelling the deposition testimony of fact witnesses

in a lawsuit involving claims involving a consumer dispute pursuant to 15 U.S.C. §

1681s-2(b) of the Fair Credit Reporting Act). [8]

Similarly, in <u>Calderon v. Experian Info. Sols., Inc.</u>, 290 F.R.D. 508, 518-19, N.6 (D.

---

8. In a claim made pursuant to 15 U.S.C. § 1681s-2(b), a consumer must demonstrate that a
furnisher's procedures were not reasonable whereas, pursuant to 15 U.S.C. §1692k(c), it is the
defendant's burden to show that their processes for avoiding errors were reasonably adapted to
avoid such error, <u>see</u>, 15 U.S.C. §1692k(c). Therefore, it is MCM's burden here to present
information not only as to what its policies were, but as to what was actually done by its
employees, what training they underwent, and whether the policies were actually followed.

Idaho 2005), the district court compelled deposition testimony of dispute agents working in

Chile, despite a Fed.R.Civ.P Rule 30(b)(6) witness having testified as to the company's policies:

> [T]he fact remains that they were the individuals who were charged with handling Plaintiff's disputes, and they are therefore the only people who might have information about what was actually done, as opposed to simply what [the defendant's] policies and procedures theoretically required…' EIS's 30(b)(6) witness stated several times during her deposition that she could only testify to what the individual dispute agents were supposed to consider when evaluating Mr. Calderon's disputes, and could not testify as to how they actually handled Mr. Calderon's dispute, or to whether they generally followed EIS's policies.").

See, Calderon, 290 F.R.D. at 518-19, N.6.

MCM cannot meet the first requirement of the bona fide error defense – that the violation was "not intentional" – because its collection actions here were done with, at best, a *knowing* intent. Without so much as a shard of testimony of any fact witnesses, i.e., the six MCM employees/former employees in India who were the only individuals who reviewed and attempted to associate Ms. Brady's dispute letters with accounts within MCM's computerized systems, this Court simply cannot conclude that MCM has met any of the requirements of the bona fide error defense as set forth in §1692k(c) of the FDCPA. More specifically, MCM has proffered no evidence as to what steps were actually taken, or not taken, by its employees in India to associate Ms. Brady's dispute letters with the correct accounts (SMF at ¶¶ 34, 35, 42, 43), and yet, it is undisputed that they read and understood the letters to constitute consumer dispute requests (SMF at ¶¶ 17, 40) and took no further action to contact Ms. Brady for additional assistance with locating the accounts (SMF at ¶ 44).

To support that an error was bona fide, MCM must, at the very least, identify what error or errors occurred. MCM, however, has offered nothing; no fact witnesses, no supporting documents as to what it claims went wrong with the processing of Ms. Brady's three dispute letters. Defendant relies solely on conjecture as to what it claims *may have* gone wrong: maybe

its employees and/or systems (many of which were not mandatory for its employees to use) could not associate Cynthia with Cindy or Terrace with "Terr.",  but this does not pass a straight face test. Moreover, without fact witnesses, MCM cannot show that it *maintained* "procedures reasonably adapted to avoid any such error", see, 15 U.S.C. §1692k(c). While the 30(b)(6) witness testified as to what policies existed at the time on paper, only a fact witness can testify as to what processes were actually maintained and adhered to. This is a far cry from the "specific facts" discussed in Lupia, see, Lupia, 8 F.4th at 1195.

MCM's various theories as to why its employees were unable to locate Ms. Brady's accounts are not specific facts. MCM points to three things in Ms. Brady's letters which may have, hypothetically, caused an employee to be unable to locate her account: the fact that MCM had merged the "Cynthia Brady" accounts under the name "Cindy Brady" (see, SMF at ¶¶ 11, 14, and 15), that the street name in Ms. Brady's dispute letter was the word "Terrace" spelled out, whereas MCM's system had it merged as "Ter." (see, SMF at ¶ 43), the dispute letters did not include cents after the dollar amounts – despite the fact that no cents after the dollar amounts appeared on its report to Experian (see, Id., see also, Dkt. 1-3), and that one of the dispute letters had an error in the MCM account number (see, SMF at ¶ 43).

MCM's Fed.R.Civ.P. Rule 30(b)(6) testimony, moreover, even if taken at face value, is simply insufficient to demonstrate the existence and maintenance of procedures reasonably designed to avoid errors in associating consumer dispute letters with accounts. MCM had at some point linked three of Ms. Brady's accounts together, under the name "Cindy Brady", which apparently meant that searching for "Cynthia Brady" would allegedly yield no results (SMF at ¶¶ 13-15). MCM had several tools, however, which, if required, would have resulted in locating Ms. Brady's accounts. For example, using wildcard searches (i.e., "C* Brady"), using MCM's Credit

Browser tool, or its SalesForce database would have almost certainly located the accounts at issue, but none of these steps are required by MCM, see, SMF at ¶¶ 28-31; indeed, MCM has no evidence that any of these tools were attempted to be used here. The amount of common situations in which this system would make locating an account impossible (David/Dave, Michael/Mike, Robert/Bob, let alone the amount of name changes due to changes in marital status, for example) is simply astronomical. It is difficult to fathom that MCM's official policy does not require employees to at least use these tools when unable to locate an account.

MCM knew, in designing its policy for handling letters via its employees in India, that for each letter which was saved in the "UFA" folder, never to be seen again by any employee at MCM, and for which MCM would never send a follow up letter to the consumer requesting additional information (SMF at ¶ 40), it ran the risk of continuing to report a disputed debt while failing to note that it had been disputed by the consumer, in violation of §1692e(8) of the FDCPA. This is a far cry from a reasonable process to avoid errors in violating §1692e(8) of the FDCPA; in fact, it seems more likely to be a policy to assure that a significant amount of consumers with disputed debts are subsequently harmed by MCM's collection actions. MCM is simply not entitled to the bona fide error defense for its unequivocal violation of §1692e(8) of the FDCPA.

## CONCLUSION

MCM's failure to report Ms. Brady's disputed debts as disputed, when it continued to report them to Experian, violated § 1692e(8) of the FDCPA, and Ms. Brady suffered both tangible and intangible injuries-in-fact as a result of MCM's collection actions. MCM has failed to provide any evidence that it maintained any processes that would have avoided this error. Even more troubling, the processes that MCM claims that it does maintain are simply not

required and, therefore, are not designed to avoid errors in processing consumer disputes.

MCM's violation of §1692e(8) of the FDCPA, therefore, is not excused by § 1692k(c) of the

FDCPA's bona fide error defense. Plaintiff Brady is entitled to summary judgment on her claims.

Dated: January 10, 2025

Respectfully submitted,
Cynthia Brady,

By: /s/ David J. Philipps
One of Plaintiff's Attorneys

David J. Philipps      (Ill. Bar No. 06196285)(pro hac vice)
Mary E. Philipps      (Ill. Bar No. 06197113) (pro hac vice)
Angie K. Robertson    (Ill. Bar No. 06302858)(pro hac vice)
Philipps & Philipps, Ltd.
9760 S. Roberts Road, Suite One
Palos Hills, Illinois 60465
(708) 974-2900
(708) 974-2907 (FAX)
davephilipps@aol.com

Ryan M. Callahan      (#25363)
James R. Crump        (#78704)
Callahan Law Firm, LLC
222 West Gregory
Suite 210
Kansas City, Kansas 64114
(816) 822-4041
ryan@callahanlawkc.com
james@callahanlawkc.com

<u>**CERTIFICATE OF SERVICE**</u>

       I hereby certify that on January 10, 2025, a copy of the foregoing **Plaintiff's Motion And Memorandum In Support Of Summary Judgment** was filed electronically. Notice of this filing will be sent to the parties by operation of the Court's electronic filing system.  Parties may access this filing through the Court's system.

Joshua C. Dickinson                          jdickinson@spencerfane.com
Spencer Fane, LLP
1000 Walnut
Suite 1400
Kansas City, Missouri 64106
(816) 474-8100
(816) 474-3216 (FAX)

Shilee T. Mullin                               smullin@spencerfane.com
SPENCER FANE LLP
13815 FNB Parkway
Suite 200
Omaha, Nebraska 68154

<u>s/ David J. Philipps</u>
David J. Philipps
Philipps & Philipps, Ltd.
9760 S. Roberts Road
Suite One
Palos Hills, Illinois 60465
davephilipps@aol.com