## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF KANSAS

CYNTHIA BRADY,         )
         )
     Plaintiff,       )
         )
vs.         )     Case No. 2:24-cv-02110-JAR-RES
         )
MIDLAND CREDIT MANAGEMENT,    )
INC.,         )
         )
     Defendant.     )

## DEFENDANT'S MEMORANDUM IN OPPOSITION TO PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT

This case is one of several brought by Plaintiff's counsel as of late alleging a pro forma violation of the Fair Debt Collection Practices Act ("FDCPA") based on the failure to modify credit reporting to reflect that a debt is "disputed."[1]  In this case, like the others, Plaintiff asserts that Defendant Midland Credit Management, Inc. ("MCM") failed to modify its credit reporting to reflect that Plaintiff's three accounts were "disputed" after her counsel sent MCM three separate letters (the letters purported to be from Plaintiff herself, but her lawyers prepared and mailed each individually).  On their face, the letters demonstrate that the information provided was ambiguous, partial, and/or incorrect - potentially by design.  Counsel's failure to provide identifiable information about each of Plaintiff's accounts, despite that counsel <u>had</u> Plaintiff's full account information, resulted in MCM being unable to locate the accounts and, thus, to modify the credit reporting to "disputed."

---

[1] <u>See</u> Complaints in <u>Hobbs v. Midland Credit Management, Inc.</u>, No. 24-cv-2255 (D. Kan. June 14, 2024) (Doc. 1); <u>Campbell v. Midland Credit Management, Inc.</u>, No. 24-cv-2256 (D. Kan. June 14, 2024) (Doc. 1); <u>Foreman v. Midland Credit Management, Inc.</u>, No. 24-cv-02283 (D. Kan. July 1, 2024) (Doc. 1); <u>Contreras v. Midland Credit Management, Inc.</u>, No. 24-cv-437 (W.D. Mo. July 1, 2024) (Doc. 1).

This, Plaintiff asserts, resulted in injuries to her credit (e.g., credit reputation, rating and ability to obtain credit). The evidence in the record thoroughly dispels Plaintiff's argument, as there is not a shred of evidence to suggest any such injury or that Plaintiff was aware of the alleged credit reporting at issue. Thus, she lacks Article III standing.

On the merits, Plaintiff's FDCPA claim fails because MCM did not know, nor should it have known, based on Plaintiff's vague and incomplete claim baiting letters, that Plaintiff disputed the accounts at issue. 15 U.S.C. § 1692e(8) (stating that communication of credit information "which is known or which should be known to be false," is a violation of the FDCPA). Even if the Court were to accept any of these troublesome letters as relaying a valid dispute on Plaintiff's behalf, and determines that there is an issue of fact as to whether MCM violated Section 1692e(8), the claim still fails because MCM is entitled to the FDCPA's bona fide error defense. MCM did not intend to violate the FDCPA by credit reporting on the accounts, it credit reported the accounts in good faith, and it maintained procedures reasonably adapted to avoid improperly credit reporting on accounts. See 15 U.S.C. ¶ 1692k(c).

For all of these reasons, MCM asks that the Court deny Plaintiff's Motion for Summary Judgment (Doc. 38) and grant MCM's previously-filed Motion for Summary Judgment (Docs. 35-37).

I.    **STATEMENTS OF FACT**

A.    **Response to Plaintiff's "Statement of Material Facts Not In Dispute"**

Pursuant to Local Rule 56.1(b), Defendant responds to those facts contained in Plaintiff's Statement of Material Facts (Doc. 38 at 4-7, hereinafter "**SOF**") to which it contends a genuine issue exists (the facts that are undisputed are not included).

7.    On or around June 29, 2021, Defendant MCM loaded into its system a portfolio of defaulted debts it had purchased which contained two debts allegedly owed by Ms. Brady

originally to Synchrony Bank, one to Belk (a retailer), and another to Home Shopping Network

(HSN), see, Exhibit B[2], 22:6-25:4.

> **RESPONSE:** Disputed, in part.  The debts were not "allegedly" owed, but rather, Plaintiff admitted that she owed the debts.  (Response to Request for Admission No. 7, attached as "**Exhibit 106**."

9.      The Synchrony/HSN account was loaded into MCM's system with the name

"Cynthia Brady", see, Exhibit B, 27:16-18.

> **RESPONSE:** Disputed, in part.  MCM does not dispute that the Synchrony/HSN account was loaded into MCM's system with the name "Cynthia Brady," but states that additional information was loaded into its system in conjunction with this account, including, but not limited to, Plaintiff's birth date and Social Security Number ("SSN").  (Ex. B at 24:5-25:21.)

10.     The Synchrony/Belk account was loaded into MCM's system with the name

"Cindy Brady", see, Exhibit B, 27:1-6.

> **RESPONSE:** Disputed, in part.  MCM does not dispute that the Synchrony/HSN account was loaded into MCM's system with the name "Cynthia Brady," but states that additional information was loaded into its system in conjunction with this account, including, but not limited to, Plaintiff's birth date and SSN.  (Ex. B at 24:5-25:21.)

11.     These two accounts were automatically merged under the name "Cynthia Brady",

due to the matching information in the account, see, Exhibit B, 27:3-28:19; 36:2-37:11.

> **RESPONSE:** Disputed, in part.  The exhibit cited does not demonstrate that the two "accounts" were merged or that they were "automatically merged" under the name of "Cynthia Brady," but rather the "Consumer ID" associated with the two accounts was under the name of Cynthia Brady.

12.      Thereafter, on July 3, 2021 and August 21, 2021, MCM sent collection letters

regarding each of the two Synchrony debts to Ms. Brady under the name "Cynthia Brady", see,

attached Group Exhibit C.

---

[2] Unless otherwise noted, the exhibits cited are to Plaintiff's exhibits in support of her Motion for Summary Judgment (Doc. 38).

**RESPONSE:** Disputed, in part. The collection letters are dated July 3, 2021, and August 23, 2021, not August 21, 2021.

13.    Subsequently, on October 22, 2021, Defendant MCM loaded into its system a portfolio of defaulted debts it had purchased which included a defaulted debt allegedly owed by Ms. Brady originally to Comenity, see, Exhibit B, 28:23-30:13; 89:20-90:4.

> **RESPONSE:** Disputed, in part. The insinuation that *all* of the accounts purchased (i.e., the portfolio) were "debts" as defined by 15 U.S.C. § 1692a(5) is unsupported by the materials cited. Furthermore, MCM states that the Comenity account was in the name of "Cindy Brady." (Ex. B at 28:23-29:11.)

14.    When the Comenity account was loaded, the "Customer ID" MCM had established for the two Synchrony accounts under the name "Cynthia Brady" was merged with the new "Customer ID" created under the name "Cindy Brady", see, Exhibit B, 28:23-30:13; 35:10-23; 89:20-90:4.

> **RESPONSE:** Disputed, in part. Two of Plaintiff's three accounts were under the name of "Cindy" and the "Customer ID" defaulted to the name used in the majority of the accounts. (Ex. B at 89:21-90:8.)

15.    After this merger, the name "Cynthia" was no longer listed in the primary account information for any of Ms. Brady's three accounts and, if an MCM employee searched for the name "Cynthia" within its system, no results would have been returned, see, Exhibit B, 31:10-32:5.

> **RESPONSE:** Disputed, in part. The evidence cited demonstrates that after MCM received the three accounts, the primary contact information for Plaintiff was "Cindy Brady" and in a preliminary search for Plaintiff, the common name Cynthia Brady alone, in the absence of an account number or partial SSN, would not produce a result.

17.    MCM also began attempting to collect the Debts from Ms. Brady via negatively credit reporting each of the Debts with a status of 93, which indicates "active collections", which it began doing in October, 2021 for the Synchrony accounts, and in February, 2022 for the Comenity account, see, Exhibit B, 55:19-57:12; see also, Dkt. 1-3.

**RESPONSE:** Objection, in part. The statement that "MCM also began attempting to collect the Debts from Ms. Brady via negatively credit reporting each of the Debts" is a legal conclusion (because whether credit reporting constitutes an attempt to collect a debt is a legal determination). However, MCM does not dispute the credit reporting as stated.

18.     On January 11, 2024, with the assistance of her attorney, Ms. Brady disputed, in writing, in three letters sent via U.S. mail, three debts which MCM was reporting on her credit report: a debt owed originally to Comenity Bank, and two owed originally to Synchrony Bank, see, Dkt. 1-2; see also, Exhibit A, 55:6-10, 24-25, 92:13-15.

**RESPONSE:** Disputed, in part. MCM does not dispute that the three letters located at Doc. 1-2 were each separately sent to it on or about January 11, 2024, but states that the January 11, 2024, letters did not constitute "disputes" of Plaintiff's three accounts because they did not contain sufficient information to allow MCM to associate the letters with Plaintiff's accounts, see Doc. 1-2; and each of the three letters purportedly addressed only one of Plaintiff's three accounts, albeit with ambiguous, incomplete, and/or incorrect information, which prevented the opportunity for the letters to be cross-referenced or considered in totality in order to locate the accounts purportedly referenced therein, see Ex. B at 95:2-6, 95:20-97:11). Moreover, the evidence demonstrates that the letters were fully drafted and mailed by Plaintiff's attorney, and not merely with "the assistance of her attorney," Ex. A at 50:8-52:12.

19.     These dispute letters contained: Ms. Brady's full name, "Cynthia Kay Brady"; her full address; the dollar amount of the debts (as MCM reported on her Experian credit report); and the names of the original creditors, Synchrony Bank (for two of the Debts), and Comenity Capital Bank (for one of the Debts), see, Dkt. 1-2 at pp. 1, 3, and 5; see also, Dkt. 1-3 at pp. 2-3.

**RESPONSE:** Objection, in part. MCM does not dispute the authenticity of the letters attached to Plaintiff's Complaint, but they do not support the asserted fact that "Cynthia Kay Brady" is, indeed, Plaintiff's full name or that the dollar amounts of the debts identified are the amounts that MCM provided to Experian.

20.     Due to a scrivener's error, the letter disputing the alleged Comenity Capital debt contained an incorrect last four digits of an MCM account number, see, Dkt. 1-2 at p. 1; see also, Ex. A at 105:1-16.

**RESPONSE:** Objection, in part.  MCM does not dispute that Plaintiff's counsel misstated the Comenity Capital Bank account number in the letter to MCM purportedly concerning the Comenity Capital Bank account.  However, the materials cited do not demonstrate the reason for Plaintiff's counsel's error.

21.    The two letters disputing the Synchrony debts contained the last four digits of the

MCM account number for each debt, as they each appeared on Ms. Brady's credit report, see, Dkt.

1-2 at pp. 3, 5; Dkt. 1-3, attached as Exhibit E with the last four digits of the MCM account numbers

unredacted; see, Exhibit A, 103:1-104:17, Exhibit B, 24:12-16, 22-25.

**RESPONSE:** Disputed.  To the extent Plaintiff intimates that *only* the last four digits of the MCM account number was denominated in her credit report, this is inaccurate.  The entire MCM account number was stated on Plaintiff's credit report at issue, as well as in every letter that MCM sent to Plaintiff regarding each account.  (Plaintiff's Experian Credit Profile Report, attached "**Exhibit 105**," provisionally filed under seal; and Doc. 37-1 ¶ 5.)

23.    On March 1, 2024, with the assistance of her attorney, Ms. Brady obtained a copy

of her Experian credit report, see, Dkt. 1-3; see also, Exhibit A, 62:19-21, 90:18-23.

**RESPONSE:** Objection and Disputed, in part.  MCM does not dispute that (somehow) a copy of Plaintiff's credit report was obtained, but the evidence cited does not support that "Ms. Brady obtained a copy of her credit report," as she asserted in her deposition that, other than for purposes of her bankruptcy years ago, she has not ever personally obtained a copy of her credit report.  (Ex. A at 62:17-25.)

24.    The March 1, 2024, Experian credit report showed that MCM continued to

negatively report the Debts, that MCM updated its credit reporting of the Debts on February 24,

2024, and that MCM failed to note that any of the Debts had been disputed by Ms. Brady, see,

Dkt. 1-3; see also, Exhibit A, 92:19-94:9.

**RESPONSE:** Disputed, in part.  MCM disputes that the January 11, 2024, letters constituted a dispute of Plaintiff's accounts because the letters contained insufficient information to enable MCM to associate the letters to Plaintiff's accounts.  (Doc. 1-2; Doc. 37-1 ¶¶ 9-11.)

25.    As a result of MCM's continued credit reporting, and failure to note her dispute of

the Debts, Ms. Brady had to take the time, effort, and expense to have her attorney send a second

letter disputing the Debts (the "Lawyer Dispute Letter"), which he did on March 22, 2024, see, Dkt. 1-4; see also, Exhibit A, at 92:7-94:9.

>    **RESPONSE:** Objection and Disputed.  First, Plaintiff's citation to the Lawyer
>    Dispute Letter (Doc. 1-4) does not support the assertion that she "had to take the
>    time, effort, and expense to have her attorney send" the letter.  Furthermore, the
>    evidence cited (Ex. A at 92:7-94:9) also does not support the assertion that Plaintiff
>    "had to take the time, effort, and expense to have her attorney send a second letter
>    disputing the Debts (the "Lawyer Dispute Letter") . . . ."  Also, MCM disputes that
>    the January 11, 2024, letters constituted a dispute of the Debts, because the Letters
>    contained insufficient information to enable MCM to associate the letters to
>    Plaintiff's accounts.  (Doc. 1-2; Doc. 37-1 ¶¶ 9-11.)

26.    MCM's continued credit reporting and its failure to note that the debts were disputed when it continued to report and update the reporting of the alleged Synchrony and Comenity debts on Ms. Brady's Experian credit reports harmed her credit reputation, impaired her credit rating and her ability to obtain credit, see, Evans, 889 F.3d at 345, 349 ("[T]he failure to inform a credit reporting agency that the debtor disputed his or her debt will always have influence on the debtor, as this information will be used to determine the debtor's credit score.")(internal quotations omitted). Ms. Brady testified that she experienced stress as a result of MCM's failure to report her disputes, which manifested itself through inability to sleep, loss of appetite, as well as migraines, see, Exhibit A, at 69:22 to 70:16.

>    **RESPONSE:** Objection and Disputed.  As to the first sentence, it contains a legal
>    conclusion, not a statement of fact, as required by D. Kan. Rule 56.1(a).  As to the
>    second sentence, it is disputed because the testimony cited does not support that
>    Plaintiff experienced stress as a result of the credit reporting but rather she testified
>    that she was distraught by her sister stealing, Ex. B at 29:3-21 and 43:9-12, and she
>    does not associate her symptoms specifically to the few months that MCM was
>    reporting her debts as "undisputed," as opposed to "disputed," Ex. A at 63:22-
>    70:11.  Furthermore, regarding credit reporting, Plaintiff has numerous other
>    accounts that were being reporting on her credit report as "seriously past due"
>    during the relevant time period, (Ex. A at 77:21-81:2; and Ex. 105), and Plaintiff
>    has brought forward no evidence that any perceived injury was caused by the credit
>    reporting at issue (e.g., Ex. A at 69:22-70:24 and 78:3-85:1).

27.     According to MCM's protocol for locating and matching accounts with consumer correspondence that "does not include a valid MCM account number", such as Ms. Brady's dispute letters here, the Start of Day team in India was required to search for matching information in her letters and its system, including all information provided in the correspondence:

> "Use all the information provided in the correspondence like consumer's name, Social Security Number (SSN) full or partial, address, original account number, phone number, etc., to look for the consumer."

See, Exhibit G, filed under seal, MCM's SOD Account Search Guidelines, at DEF 0038; see also, Exhibit B, 40:25-41:22.

**RESPONSE:** Objection, in part. Where the Start of Day team employees ("SOD team") are located is not a material fact.

28.     If the MCM employee in India attempting to locate an account is unable to locate an account using this information, MCM's guidelines permit, but do not require, its employees to use a wildcard to search for variations on a consumer's first name, last name, or address, see, Exhibit B, 49:14-24.

**RESPONSE:** Objection, in part. Where the employee is located is not a material fact.

29.     If the MCM employee in India is unable to locate an account after performing the above, MCM's procedures state that they are to search a separate database, Salesforce, to locate the consumer by name, see, Exhibit G, at DEF 0038.

**RESPONSE:** Objection, in part. Where the employee is located is not a material fact. Furthermore, this statement is vague as it is unknown to what Plaintiff refers by "after performing the above." However, MCM does not dispute that its employees may use a Salesforce search feature to look up a consumer's account by name.

30.     If the MCM employee in India is unable to match the account still after searching Salesforce, they are to: "Look for any possible matches with any other additional information, such as the name and balance of the original creditor.", see, Exhibit G, at DEF054.

**RESPONSE:** Objection, in part. Where the employee is located is not a material fact. However, MCM does not dispute that if the employee is unable to locate the account utilizing certain search guidelines, they are to "[l]ook for any possible matches with any other additional information, such as the name and balance of the original creditor."

31.    If an account is located, but additional confirmation is required, MCM employees may, but are not required to, use a tool called "Credit Browser", which can be used to confirm a partial address or name, or confirm a consumer's full name based on address alone, see, Exhibit B, 51:17-52:16, Exhibit G, at DEF055.

**RESPONSE:** Disputed, in part. This statement assumes that Plaintiff's accounts were located, which they were not (e.g., SOF 43, infra), and Credit Browser may only be used to confirm a consumer's full name where the consumer's last name and address have already been matched in MCM's system of record. (Ex. G at DEF0055.)

32.    If unable to locate an account still, having completed the steps outlined in ¶¶ 27-31, supra., MCM's processes require that three separate MCM employees search for the account for three consecutive days, followed by a final attempt on a seventh working day by another employee, see, Exhibit B, 48:15-49:13.

**RESPONSE:** Objection. This Statement is vague and unclear and is not supported by the materials cited. The testimony located at Ex. B does not specify the steps outlined in ¶¶ 27-31.

34.    MCM has no evidence that its employees used wildcard searches in processing Ms. Brady's three dispute letters, see, Exhibit B, 71:18-72:1.

**RESPONSE:** Objection. This statement is not material, as MCM's procedures do not require its employees to use wildcard searches. (Ex. B at 42:2-4 and 49:14-24.) Furthermore, as set forth in SUMF[3] ¶¶ 81(n)-(o), infra, due to the way "Cynthia" and "Cindy" are spelled, to catch both of those names, a "C*" would have had to be inserted into the search, which would have resulted in numerous results. (Ex. B 87:12-88:15.)

---

[3] "**SUMF**" refers to MCM's Additional Statement of Material Undisputed Facts, infra.

35.    MCM has no evidence that its employees used Credit Browser to attempt to match an account to Ms. Brady's three dispute letters, see, Exhibit B, 51:14-16.

> **RESPONSE:** Objection.  This statement is not material, as MCM's procedures do not require its employees to use Credit Browser.  (Ex. B at 42:2-4 and 49:14-24.)  Furthermore, use of Credit Browser, could not have been used in this circumstance because it is a search engine and is used only if an account is located but additional information is required.  (Doc. 46 at 7.)  Here, no accounts were located.  (SOF ¶ 33.)  Thus, Credit Browser would not have aided MCM's employees in their search.  (Doc. 46 at 7; SOF ¶ 33.)

36.    MCM received Ms. Brady's three dispute letters and, on January 23, 2024, they were scanned and time/date stamped by MCM's mailroom employees, see, attached Exhibit B, 46:20-25, 82:1-83:19; see also, attached Exhibit C, MCM's Document Production Bates Nos. DEF0465-0470.

> **RESPONSE:** Disputed, in part.  MCM does not dispute that it received the letters dated January 11, 2024, on January 23, 2024, or that each was scanned and time/date stamped, but disputes that any of the letters clearly identified that they pertained to Plaintiff.  (Doc. 1-2.)  Moreover, the letters were not from Ms. Brady but, rather, were drafted and sent by her attorney.  (Brady Dep. 50:8-51:15.)

37.    According to MCM's procedures, after the letters were received and scanned into MCM's system by the mailroom employees, they were delivered, electronically, to the "Start of Day" team, located in India, see, Exhibit B, 40:20-24.

> **RESPONSE:** Objection, in part.  Where the employees are located is not a material fact.

38.    Between January 24, 2024 and January 30, 2024, following the processes outlined in ¶¶ 29-33 supra., six different MCM employees in India attempted to, but, apparently, could not successfully match any of Ms. Brady's three dispute letters to her account, see, attached Exhibit H, September 12, 2024 email from MCM's attorney, Shilee Mullin, to Ms. Brady's attorney, David J. Philipps.

> **RESPONSE:** Objection, in part.   MCM does not dispute that its employees attempted to but did not successfully match the dispute letters at issue to Plaintiff's

accounts, but Plaintiff's incorporation of five prior statements renders this SOF compound, which is contrary to D. Kan. Rule 56.1(a), which requires that the statement of material facts be "concise."

40.     The file names for each of the three letters began with "NA_FACTACT_CND", which indicates that, at some point, an MCM employee who saved the letter understood that it was a consumer dispute and cease contacts demand, see, attached Exhibit I, filed under seal, (MCM's Indexing Guidelines, DEF0068); see also, Exhibit H.

**RESPONSE:** Disputed.  The materials cited, Exs. I and H do not support the asserted fact.

41.     MCM has produced no business records which would indicate what steps, if any, were followed by its employees in reviewing and handling the dispute letters at issue, nor how long each one of them spent attempting to locate the accounts.

**RESPONSE:**  Objection.  This asserted fact is not supported by any citation to the record as required by D. Kan. Rule 56.1(a).  Furthermore, this statement assumes that business records must be produced, which is an unsupported legal proposition.

43.     MCM's 30(b)(6) deponent, Ms. Canez, offered three possible explanations that MCM's employees were unable to match Ms. Brady's dispute letters to any of the three debts it was credit reporting: 1) the primary name on the account in MCM's system was "Cindy Brady", rather than "Cynthia Brady" (see, SUMF ¶¶ 11-15, supra), 2) the street name in the dispute letters was spelled out "Terrace", whereas its system had abbreviated it as "Ter." (see, Exhibit B 42:21-45:13), 3) the dispute letters listed the dollar amounts, but not the cents, for each disputed debt (see, Exhibit B, 46:2-7), even though MCM acknowledged that the credit report did not include cents (see, Exhibit B, 57:8-10), and 4) one of the debts included an incorrect MCM account number (see, Exhibit B, 47:25-48:14).

**RESPONSE:**  Disputed, in part.  Plaintiff's SOF suggests that there were *only* three possible reasons that the employees were unable to match the three separate letters to Plaintiff's accounts, which is disputed by the record.  Instead, Ms. Canez testified that those were some of the possible reasons that there was not a match, but there

were others, including that the letters contained only a partial—and in one instance, incorrect—account number, as well as Plaintiff's counsel's use of separate letters. (Ex. B at 42:21-43:13, 45:20-46:14, 93:2-96:2.)

44.    Aside from saving the three letters into the "UFA" folder, no employee at MCM took any other action to notify Ms. Brady that its employees were unable to locate her accounts, see, Exhibit B, 51:14-51:7; Exhibit D, 106:2-10.

> **RESPONSE:** Objection. The materials cited, Ex. B at 51:14-17 and Ex. D, do not support this SOF. Furthermore, this statement ignores that the January 11, 2024, letters advised not to contact the sender about the debt. (Doc. 1-2.)

45.    As a result of MCM's failure to locate Ms. Brady's three accounts, it continued to report the Debts to Experian and updated that reporting in February, 2024 while failing to note that the Debts had been disputed by Ms. Brady, see, Dkt. 1-3; Exhibit E.

> **RESPONSE:** Disputed, in part. MCM does not dispute that it continued to report her accounts after receipt of the letters dated January 11, 2024, but states that it did so because it did not know the Debts were disputed by Plaintiff. (Canez Decl. ¶ 11.)

46.    On March 29, 2024, MCM's employee, MCM India Employee 3, reviewed and processed Ms. Brady's Lawyer Dispute Letter (Dkt. 1-4), located all the three of the Debts at issue, and noted Ms. Brady's dispute and attorney representation, see, Exhibit B, 59:20-61:16.

> **RESPONSE:** Objection, in part. Where the employee is located is not a material fact.

## B.    Defendant's Additional Statement of Undisputed Material Facts

Pursuant to D. Kan. Rule 56.1(b), in opposition to Plaintiff's Motion for Summary Judgment, MCM includes the following additional facts (hereinafter referred to as "**SUMF**"), many of which are included in MCM's Memorandum in Support of Motion for Summary Judgment, (Doc. 36 at ¶¶ 1-62).

**MCM's Policies and Procedures**

47.    MCM purchases charged-off accounts and when it does so, it assigns its own unique nine-digit account number to each account (hereinafter referred to as "**MCM Account Number**"), which is distinct from the account number that was assigned by the original creditor.  (Declaration of Bernadette Canez ("**Canez Decl**."), located at Doc. 37-1, ¶ 4.)

48.    MCM uses the MCM Account Number when communicating with the consumer. (Canez Decl. ¶ 4.)

49.    MCM receives thousands of pieces of correspondence via mail every week and has a dedicated employee team (the Customer Support Services (CSS) Start of Day (SOD) team (hereinafter "**SOD team**")) to ingest (i.e., to review and process) those documents.  (Canez Decl. ¶ 6.)

50.    Per MCM's policies and procedures, if MCM is presently credit reporting on an account and it receives correspondence from the consumer disputing the account, MCM modifies its credit reporting of the account to "disputed."  (Canez Decl. ¶ 7.)

51.    When the SOD team receives correspondence, it attempts to match the correspondence to accounts in MCM's system.  (Bernadette Canez Deposition ("**Canez Dep.**"), located at Doc. 37-2, at 40:20-41:4.)

52.    MCM's policies and procedures provide that if the correspondence does not include a valid MCM Account Number, the SOD team attempts to match the correspondence to an account using information set forth in the correspondence, including the consumer's name, Social Security Number, full or partial address, original account number, and phone number.  (Canez Dep. 41:5-14.)

53.     If the correspondence does not contain sufficient consumer information to locate an account in MCM's system, MCM's policies and procedures state that the correspondence should be moved to a "UFA" (Unable to Find Account) folder.  (Canez Dep. 46:20-47:12.)

54.     After the correspondence is moved to the UFA folder, MCM's policies and procedures require multiple SOD team members to review the correspondence multiple times within a seven-day time period to attempt to match the correspondence to an account, and if the team members are unable to match the correspondence within that time period, the correspondence stays in the UFA folder.  (Canez Dep. 48:15-49:13.)

**Counsel's January 11, 2024, Letters To MCM**

55.     Plaintiff's counsel at Callahan Law Firm, LLC drafted three separate letters dated January 11, 2024 (hereinafter "**January 11 Letters**"), to MCM pertaining to three accounts that Plaintiff had with MCM.  (Cynthia K. Brady Deposition ("**Brady Dep.**"), located at Doc. 37-3, at 50:8-51:15.)

56.     Plaintiff does not know which person at her attorney's law firm drafted the January 11 Letters, but Plaintiff herself did not draft them.  (Brady Dep. 50:8-14.)

57.     Plaintiff did not mail the January 11 Letters and signed them on her phone.  (Brady Dep. 53:17-54:6.)

58.     Plaintiff's counsel placed the January 11 Letters in three separate envelopes and mailed each individually, (Doc. 1-2; Brady Dep. 50:8-14, 54:4-23); and this caused the January 11 Letters to be analyzed independently by the SOD team, (Canez Dep. 95:18-22.)

59.     To enable her attorneys to draft the January 11 Letters, Plaintiff relayed MCM's correspondence to her attorney (Brady Dep. 52:1-4), but she played no role in deciding the content of the January 11 Letters, or in mailing the letters, (Brady Dep. 52:8-53:19).

60.    When MCM provides letters to consumers, it includes myriad information, including the MCM Account Number.  (Canez Dep. 91:3-15.)

61.    In communications that MCM provided to Plaintiff, MCM included Plaintiff's entire nine-digit MCM Account Number.  (Canez Decl. ¶ 5.)

62.    In communications that MCM provided to Plaintiff, MCM included Plaintiff's entire account balances (i.e., $329.79, $930.60, and $623.21).  (Canez Decl. ¶ 5.)

63.    The first January 11 Letter (hereinafter referred to as "**the Comenity Letter**") states as follows:

Midland Credit Management
350 Camino De La Reina, Ste. 300
San Diego, CA 92108

Date    01 / 11 / 2024
Re:    Cynthia Kay Brady
       Ks▮▮▮▮▮▮▮

Dear Midland Credit Management,
You are credit reporting that I owe $329 to Comenity Capital Bank regarding an account ending in 1008. I dispute this debt and do not want to be contacted about it by your company. I am not requesting validation.

Thank you,

Cynthia Brady

(Doc. 1-2 at 1.)

64.    The second letter states as follows:

Midland Credit Management
350 Camino De La Reina, Ste. 300
San Diego, CA 92108

Date    01 / 11 / 2024
Re:    Cynthia Kay Brady
       Ks▮▮▮▮▮▮▮

Dear Midland Credit Management,
You are credit reporting that I owe $930 to Synchrony Bank regarding an account ending in 4853. I dispute this debt and do not want to be contacted about it by your company. I am not requesting validation.

Thank you,



Cynthia Brady

(Doc. 1-2 at 3.)

65.    The third letter states as follows:



(Doc. 1-2 at 5).

66.     For all three January 11 Letters, MCM's SOD team followed its policies and procedures to attempt to associate each of the January 11 Letters with a consumer's account but was unable to do so.  (Canez Dep. 16:19-17:20, 19:6-20:22, 83:20-84:11.)

67.     MCM received the January 11 Letters on January 23, 2024, and reviewed each individually at that time.  (Canez Decl. ¶ 9.)

68.     On January 23, 2024, because the MCM SOD team was unable to associate any of the separate January 11 Letters to an MCM account, the January 11 Letters were placed in an UFA folder.  (Canez Decl. ¶ 10.)

69.     Subsequent to January 23, 2024, four separate MCM SOD team members reviewed the January 11 Letters on January 24, 2024, January 25, 2024, January 26, 2024, and January 30, 2024, but were unable to associate them to accounts.  (Canez Decl. ¶ 10.)

70.     None of the January 11 Letters included Brady's Social Security Number ("**SSN**") or even the last four digits of it.  (Doc. 1-2.)

71.     None of the January 11 Letters included Brady's date of birth ("**DOB**").  (Doc. 1-2.)

72.     None of the January 11 Letters referenced the original creditor's account number, in whole or in part.  (Doc. 1-2; Canez Decl. ¶ 9.)

73.     None of the January 11 Letters correctly identified a complete MCM Account Number.  (Doc. 1-2; Canez Decl. ¶ 9.)

74.     One of the January 11 Letters included an incorrect partial account number that does not match any MCM Account Number associated with Plaintiff.  (Canez Decl. ¶ 9.)

75.     None of the January 11 Letters included a telephone number.  (Doc. 1-2.)

76.     Had Plaintiff's counsel included the entire nine-digit MCM Account Number in the Letters, "[t]hat would have been almost an instant match guarantee."  (Canez Dep. 73:21-25.)

**This Lawsuit and MCM's Post-Litigation Review**

77.     Plaintiff's counsel filed the instant lawsuit on March 25, 2024.  (Doc. 1.)

78.     Three days before filing suit, Plaintiff's counsel, David Philipps, sent MCM a letter dated March 22, 2024, regarding credit reporting of all three accounts, and requested that the accounts be credit reported as disputed (hereinafter "**March 22 Letter**").  (Doc. 1-4.)

79.     Upon receipt of the March 22 Letter, which included information for each of Plaintiff's three accounts in a single letter, MCM was able to associate the March 22 Letter to the Debts[4] (Canez Dep. 67:17-68:3, 69:20-25, 95:15-96:19); and the "biggest difference" impacting the SOD team review process between its receipt of the January 11 Letters and the March 22 Letter, was the decision by Plaintiff's counsel to relay disputes via three separate and separately mailed communications as opposed to including them in one composite letter as was done in the March 22 Letter, (Canez Dep. 95:2-96:2).

80.     When MCM received Plaintiff's counsel's March 22 Letter, and was able to associate the March 22 Letter to the Debts (Canez Dep. 58:24-61:16), it promptly updated the

---

[4] The "**Debts**" refers collectively to a charged-off Comenity Capital Bank account and two charged-off Synchrony Bank accounts.

credit reporting on the Debts to note that the Debts are "disputed," (Canez Decl. ¶ 12; <u>see</u> Doc. 34 ¶ 2(a)(vi)).

81.    In addition, other inconsistencies and inaccuracies within the January 11 Letters may have contributed to the SOD team not being able to associate the January 11 Letters with the accounts.  (Canez Dep. 94:19-23.)  Those issues included:

(a)    Plaintiff also goes by "Cindy Brady."  (Brady Dep. 15:2-5.)

(b)    Plaintiff signed up for two of the accounts at issue in the name of "Cindy Brady," (Brady Dep. 59:14-62:16), and, thus, Plaintiff's name is identified in MCM's DM system (MCM maintains consumer accounts in a "Debt manager" or "DM system" (Canez Dep. 22:14-23:2)), for all the Debts as "Cindy Brady," (Canez Dep. 28:14-22, 35:2-23, 37:15-20).

(c)    Because Plaintiff's name is identified in MCM's DM system as "Cindy Brady," attempting to locate an account in the name of Cynthia Brady would not have located Plaintiff's accounts.  (Canez Dep. 31:10-32:5, 37:15-20, 80:19-24.)

(d)    Plaintiff's address contained in the original creditors' account statements included "TER" in the address, not "Terrace," as was in the January 11 Letters.  (Canez Dep. 42:21-43:19, 71:3-5.)

(e)    Plaintiff's address identified in the January 11 Letters was different than the address identified in MCM's DM system, in that the address in the January 11 Letters included "Terrace" and the DM system notes included "TER."  (Canez Dep. 43:7-45:13, 71:1-7.)

(f)    The balances identified in the January 11 Letters were not an exact match to Plaintiff's charged-off account balances.  (Canez Dep. 46:2-12, 94:5-8.)

(g)    None of the January 11 Letters included Brady's SSN or even the last four digits of it.  (Doc. 1-2.)

(h)    None of the January 11 Letters included Brady's DOB.  (Doc. 1-2.)

(i)    None of the January 11 Letters identified the original creditor's entire account number or any portion of it.  (Doc. 1-2; Canez Dep. 74:4-12, 93:20-25.)

(j)    None of the January 11 Letters identified a complete MCM Account Number. (Doc. 1-2; Canez Dep. 72:10-12, 93:14-19.)

(k)    One of the letters included a wholly incorrect partial account number that does not match any MCM Account Number associated with Plaintiff.  (Canez Dep. ¶ 9.)

(l)     None of the January 11 Letters included a telephone number.  (Doc. 1-2.)

(m)    The Comenity Letter included four digits of an account that was a complete mismatch from either the MCM Account Number or the original creditor's account number.  (Canez Dep. 70:17-24, 93:2-13.)

(n)     MCM could have performed a wild card search, where the SOD team member inserts the first few letters of something to be searched and puts an asterisk at the end of it, but due to the way "Cynthia" and "Cindy" are spelled, to catch both of those names, a "C*" would have had to be inserted into the search.  (Canez Dep. 87:12-88:11.)

(o)     Inserting "C*" into the wild card search would have resulted in numerous results. (Canez Dep. 88:12-15.)

82.    When MCM fails to match a letter to an account, it does not reach out to the letter writer and ask for additional information because: (1) MCM's letters are geared toward consumers directly and, as such, it is required to put items in the letter like account numbers and balances, but if it cannot associate a letter with an account, MCM does not have the necessary information to correspond with the letter writer; and (2) there is a risk of improper third-party disclosure with sending the letter to the wrong person.  (Canez Dep. 91:3-20.)

83.    In regard to the January 11 Letters, the letter writer (Plaintiff's counsel) expressly asked MCM not to contact her.  (Canez Dep. 91:21-92:6.)

84.    Had MCM been able to associate the January 11 Letters to the Debts, it would have modified the credit reporting of the Debts to "disputed," and the only reason MCM continued to credit report the Debts as undisputed after receipt of the January 11 Letters was that, despite following its processes and procedures, it was unable to associate the January 11 Letters with the Debts.  (Canez Decl. ¶ 11.)

85.    MCM did not intend to violate the FDCPA by reporting the Debts as undisputed after Plaintiff's counsel sent the January 11 Letters to MCM.  (Canez Decl. ¶ 8.)

86.    MCM acted in good faith when it reported the Debts as undisputed.  (Canez Decl. ¶ 11.)

87.    Plaintiff has not produced any evidence to refute that MCM's error was unintentional or to refute that MCM acted in good faith when it reported the Debts as undisputed. (Plaintiff's Response to Request for Production Nos. 1 and 7, located at Doc. 37-3 at pp. 29-30.)

**Plaintiff's Alleged Injury and Damages**

88.    Plaintiff does not know if the amount that MCM was attempting to collect on the Debts was incorrect.  (Brady Dep. 74:25-75:3.)

89.    Plaintiff obtained a copy of her credit report on March 1, 2024 through her lawyers in this case.  (Brady Dep. 90:18-24.)

90.    Plaintiff does not know if MCM was accurately credit reporting the status of the Debts in January, February, or March 2024.  (Brady Dep. 65:20-66:6, 85:7-13.)

91.    Plaintiff does not know what type of credit report MCM provided to any of its credit reporting agencies with respect to the Debts.  (Brady Dep. 65:5-9.)

92.    Plaintiff does not know if MCM ever changed the credit report that was given to its credit reporting agencies to reflect that she disputed the Debts.  (Brady Dep. 65:10-14.)

93.    Plaintiff does not know what her credit score was at the time she alleges the Debts were being improperly reported as "undisputed" or after MCM began reporting the Debts as "disputed."  (Brady Dep. 66:7-15.)

94.    Plaintiff does not contest that MCM changed its credit reporting of the Debts to "disputed" as of March 28, 2024.  (Brady Dep. 65:15-19.)

95.    At no time between January 1, 2024, and April 1, 2024, did Plaintiff attempt to obtain any credit.  (Brady Dep. 67:7-10.)

96.     After MCM changed the credit reporting of the Debts to "disputed," Plaintiff attempted to obtain credit via credit cards twice and was denied.  (Brady Dep. 67:11-69:12.)

97.     Plaintiff does not know if any third parties reviewed her credit report between January 1, 2024, and April 1, 2024, (Brady Dep. 69:46-20); and there were no credit inquiries during that time, (Ex. 105).

98.     Plaintiff never reviewed her credit report at issue before her deposition in this case. (Brady Dep. 76:19-77:20.)

99.     Plaintiff does not know whether MCM's credit reporting of the Debts between January and March 2024 had any impact on her credit score.  (Brady Dep. 69:18-21.)

100.    Plaintiff asserts that she has migraines and does not sleep well, but she does not associate those alleged symptoms to MCM's credit reporting between January 11, 2024, and March 28, 2024, and Plaintiff does not assert that she suffered any medical conditions as a result of the credit reporting.  (Brady Dep. 69:22-70:24.)

101.    Plaintiff has not paid her attorney any money, nor has she received any invoices from her attorneys in this case.  (Brady Dep. 72:11-18.)

102.    Plaintiff has not alleged that she suffered any physical or monetary harm from the credit reporting.  (Doc. 1; Brady Dep. 70:12-24, 72:14-73:14, 74:1-24.)

103.    Plaintiff has no documents to support any actual damages in this case.  (Brady Dep. 74:1-24, 76:6-18.)

104.    Plaintiff does not know if MCM was reporting her accounts incorrectly between January and March 2024.  (Brady Dep. 84:5-85:13.)

105.    As of March 1, 2024, Plaintiff had numerous accounts other than the Debts that were identified on her credit report as past due, seriously past due, or with an unpaid balance. (Brady Dep. 78:3-81:2.)

106.    In her Interrogatory Answer No. 3, Plaintiff asserted that "Defendant's failure to note that the debts were disputed when Defendant reported . . . harmed her credit reputation, impaired her credit rating and her ability to obtain credit; moreover, Defendant's collection actions alarmed, confused and emotionally distressed Ms. Brady," and she had to "expend her time, effort and expense to have her counsel send Defendant a letter demanding that it cease its improper credit reporting." (Plaintiff's Answer to Interrogatory No. 3, located at Doc. 37-3 at p. 34.)

107.    Plaintiff's Answer to Interrogatory No. 3 is untrue because Plaintiff has not paid her counsel money for anything, including, but not limited to, for sending the letter dated March 22, 2024. (Compare id., with Brady Dep. 72:11-18.)

108.    Plaintiff's Answer to Interrogatory No. 3 is untrue because there is no evidence that the credit reporting impaired Plaintiff's credit rating or her ability to obtain credit. (Compare Plaintiff's Answer to Interrogatory No. 3, located at Doc. 37-3 at p. 34, with Brady Dep. 65:5-67:10, 69:13-21.)

109.    Plaintiff does not know if MCM telephoned her after January 11, 2024, and does not assert that it did. (Brady Dep. 89:5-8.)

## II.    SUMMARY JUDGMENT STANDARD

Although Plaintiff did not address this issue, it is Plaintiff's burden to prove Article III standing. Ojogwu v. Rodenburg Law Firm, 26 F.4th 457, 461 (8th Cir. 2022).

## III.    ARGUMENT

### A.    Plaintiff Has Not Met Her Burden To Establish Article III Standing

Plaintiff asserts that she has standing because MCM's failure to note that her Debts were disputed (which occurred for approximately three months, Plaintiff's SOF ¶¶ 6, 36) caused her intangible injuries, which are "rooted in common law fraud/defamation," as the credit reporting harmed her credit reputation, impaired her credit rating, and her ability to obtain credit.  (Doc. 38 at 15-16.)  Plaintiff also asserts that due to the credit reporting, she experienced concrete tangible injuries "by spending additional time, money, and effort in order to have her attorney send a letter to MCM . . . ."  (Doc. 38 at 16.)  Both asserted bases to establish Article III standing are insufficient.

### 1.    Plaintiff Has Not Established An Intangible Injury

#### a.    Common Law Fraud

First, Plaintiff asserts that her injuries from the three-month credit reporting are rooted in common law fraud.  (Doc. 38 at 15.)  Plaintiff's assertion is far-fetched.  There is nothing "similar," let alone "close" between Plaintiff's claim and a fraud claim.  See Spokeo, Inc. v. Robins, 578 U.S. 330, 340 (2016) (holding that courts should assess whether the alleged injury to the plaintiff has a "close relationship" to harm "traditionally recognized as providing a basis for a lawsuit in American courts), as revised (May 24, 2016); TransUnion LLC v. Ramirez, 594 U.S. 413, 425 (2021) (citing Spokeo, 578 U.S. at 341); Shields v. Pro. Bureau of Collections of Maryland, Inc., 55 F.4th 823, 828 (10th Cir. 2022).

Under Kansas law, the "elements of fraud are: (1) an untrue statement of fact, (2) known to be untrue by the party making it, (3) made with the intent to deceive or with reckless disregard for the truth, (4) upon which another party justifiably relies and (5) acts to his detriment [i.e., sustained damages by relying upon the statement]."  Uhlig LLC v. CoreLogic, Inc., No. 21-2543, 2024 WL 2864380, at *14 (D. Kan. June 6, 2024) (citations omitted); Hale v. Emporia State Univ.,

No. 16-4182, 2018 WL 1609552, at *2 (D. Kan. Apr. 3, 2018).  The Tenth Circuit, when determining whether a plaintiff's FDCPA claim resulted in the same kind of harm as required by the tort of fraud, determined that "fraud recognizes that harm may flow from relying on a misrepresentation . . . ."  Shields, 55 F.4th at 830 (citing Trichell v. Midland Credit Mgmt., Inc., 964 F.3d 990, 998 (11th Cir. 2020) (holding that "[i]n short, under our common-law tradition, "there can be no recovery if the plaintiff is none the worse for the misrepresentation, however flagrant it may have been.")).

In Shields, because the plaintiff did not plead reliance, the Court determined that the plaintiff did not allege the same kind of harm as required by the tort of fraud.  (Id.)  Likewise, in this case, Plaintiff did not allege (or demonstrate) that she relied upon the credit reporting at issue.

Moreover, Plaintiff has not demonstrated the other elements of common law fraud.  She has not demonstrated that MCM *knew* the credit reporting was false, or that it made the credit reporting with an "intent to deceive or with reckless disregard for the truth."  (See SOF ¶¶ 7-46.)  Also, Plaintiff has not alleged (or demonstrated) that she relied on the credit reporting.  (Id.)  Indeed, Plaintiff's testimony revealed that she was not even aware of the credit reporting issue during the short time her debt was reported as not in dispute.  (SUMF ¶¶ 90, 98, 104.)

Finally, as set forth below (Argument § A.2, infra), Plaintiff has not demonstrated that she acted to her detriment (i.e., that she has any damages whatsoever).  "Fraud without damage, or damage without fraud, gives no cause of action . . . ."  Trichell, 964 F.3d at 998 (holding that common law furnished no analog to the FDCPA claims asserted and, thus, plaintiffs did not have article III standing).  For all these reasons, the asserted common law fraud analog fails.

### b.  Defamation

Next, Plaintiff asserts that she has demonstrated an intangible injury because the credit reporting bears a close relationship to defamation.  (Doc. 38 at 15.)  The undisputed facts in this case do not support her claim.

### i.  Case Law Concerning Defamation As A Common-Law Analogue

"The elements of defamation include false and defamatory words, communicated to a third person, which result in harm to the reputation of the person defamed."  Marcus v. Swanson, 539 P.3d 605, 609 (2023).  In TransUnion, the Court found that American law has stood for the proposition that an individual is injured "when a defamatory statement that would subject him to hatred, contempt, or ridicule is published to a third party."  TransUnion, 594 U.S. at 433 (citations omitted).  Relying on this definition, the Court determined that the class members whose misleading credit reports were disseminated to third-party businesses "suffered a harm with a 'close relationship' to the harm associated with the tort of defamation[,]" and as such, "suffered a concrete harm that qualifies as an injury in fact."  594 U.S. at 432.  By contrast, however, the class members whose misleading credit reports were *not* disseminated to a third party "did *not* suffer a concrete harm[,]" and thus did not have Article III standing to bring their claims.  Id. at 439, 442 (emphasis added).

Furthermore, the Tenth Circuit has reiterated that there is a "necessary" defamation component that the tortious words are published.  Lupia v. Medicredit, Inc., 8 F.4th 1184, 1192 (10th Cir. 2021).  "Publication" requires more than merely evidence that an untrue statement was made (here, to a credit reporting agency).  TransUnion, 141 S.Ct. at 2209-10.  It requires that the third person actually understand the defamatory significance of the matter.  Restatement (Second) of Torts § 577 (1977) (stating "since publication requires that the defamatory matter be

communicated to a third person, it is necessary not only that the defamatory matter be brought to the attention of a third person, **but that he understands its defamatory significance**," (emphasis added)).

Plaintiff relies upon a handful of cases to support her assertion that the failure to credit report a debt as disputed, without more, is enough to demonstrate an injury-in-fact for purposes of Article III standing. A fair review of the cases to which Plaintiff cites dispels her legal conclusion. Moreover, her conclusion is contrary to Supreme Court precedent.

First, she cites to Dotson v. AWA Collections, No. 22-6078, 2023 WL 3055574, at *4 (10th Cir. Apr. 24, 2023), but that case concerned whether plaintiff had standing as an assignee to bring actions on behalf of third parties. The question before the Court was whether those assignments are valid under state law. Id. *2. In the context of resolving that question, the Court cited to Llewellyn v. Allstate Home Loans, Inc., 711 F.3d 1173, 1189 (10th Cir. 2013) for the proposition that Section 1692e(8) is rooted in the basic fraud law principle that, "if a debt collector *elects* to communicate 'credit information' about a consumer, it must not omit a piece of information that is always material, namely, that the consumer has disputed a particular debt." Llewellyn in turn cited to Wilhelm v. Credico, Inc., 519 F.3d 416 (8th Cir. 2008) for the same proposition. Llewellyn, 711 F.3d at 1189. Of course, Llewellyn and Wilhelm were issued before the Supreme Court's decision in TransUnion, and they do not address the issue of Article III standing.

Plaintiff then cites to two Seventh Circuit cases, Ewing v. MED-1 Sols., LLC, 24 F.4th 1146, 1149 (7th Cir. 2022) and Evans v. Portfolio Recovery Assocs., LLC, 889 F.3d 337, 349 (7th Cir. 2018), but those cases are inapposite. In Ewing, plaintiffs submitted their credit reports and other documentary *evidence*, which demonstrated that their credit scores were impacted by defendant's conduct. See Ewing, 24 F.4th at 1150, 1154. The court found that the plaintiffs proved

publication (which is a necessary element of defamation) _because_ they "submitted evidence that TransUnion's assessment of their creditworthiness took into account whether a debt was disputed or not." Id. at 1154. Here, as set forth below, Plaintiff has submitted no evidence whatsoever that demonstrates that Experian's assessment of Plaintiff's creditworthiness took into account whether a debt was disputed or not. (SUMF ¶¶ 93, 98, 99.)

Next, Plaintiff cites to Evans for the proposition that the failure to inform a credit reporting agency that the debtor disputed the debt "will _always_ have influence on the debtor . . . ." (Doc. 38 at 7, 15.) Evans was issued before TransUnion, and the Seventh Circuit has recognized that "TransUnion alters our understanding of Spokeo and supersedes Evans to the extent Evans says that a mere risk of harm is a sufficiently concrete injury to support a suit for damages." Ewing, 24 F.4th at 1152; Wood v. Sec. Credit Servs., LLC, No. 23-2071, 2025 WL 314383, at *4 (7th Cir. Jan. 28, 2025). Thus, the proposition of law to which Plaintiff relies upon from Evans is no longer good law.

Moreover, the proposition of law that Plaintiff champions, that a violation of Section 1692e(8) _always_ constitutes an injury-in-fact, is contrary to the Supreme Court's admonition that a plaintiff does not automatically satisfy the injury-in-fact requirement whenever a statute grants a person a statutory right and purports to authorize that person to sue to vindicate that right. TransUnion, 594 U.S. at 426. The tendered legal conclusion also disregards the required "close relationship" to the harm associated with defamation because reputational harm would be impossible without disclosure of the credit information to someone other than the credit agency. Campbell v. Portfolio Recovery Associates, LLC, No. 21-1322, 2022 WL 657225, at *2 (E.D.N.Y. Mar. 4, 2022); Grauman v. Equifax Info. Servs., LLC, 549 F. Supp. 3d 285, 291-92 (E.D.N.Y. 2021).

In <u>Grauman</u> the court held that there could be no defamation-like harm unless the credit report was disseminated to a third party, reasoning as follows:

> Nowhere, however, does Grauman allege that his credit report was disseminated to third parties—neither in the brief period when the notation of his loan payment suspension appeared on his credit report, nor during the even briefer period between the removal of that notation and the filing of this action. *Id.* ¶¶ 9, 19. Grauman is, therefore, unlike the first group of plaintiffs in *Ramirez*, who suffered defamation-like reputational harms after third parties obtained credit reports falsely implying they were terrorists. *Cf. Ramirez*, 141 S. Ct. at 2208-9. Rather, Grauman is comparable to the second group of plaintiffs, whose reputations could not have been concretely harmed because their inaccurate credit reports were never disseminated. *Cf. id.* at 2209-13. In sum, the notation of Grauman's loan suspension on his credit report and the diminution in his credit score are insufficient, standing alone, which they do stark nakedly in the complaint, to demonstrate a concrete reputational injury.

<u>Id.</u> at 292.

In fact, many courts have held that even if the plaintiff has a drop in credit score (which Plaintiff has not demonstrated here) that is insufficient to state an injury-in-fact where plaintiffs do not demonstrate that it was disseminated or accompanied by any other injury resembling a historically recognized harm.  <u>Id.</u> at 292 n.3 (citing cases).

Here, in accordance with <u>TransUnion</u>, the Court should conclude that to establish an injury-in fact, Plaintiff is required to do more than demonstrate that MCM failed to notate the Debts as "disputed," which, as set forth below, Plaintiff has not done.

### ii.    Evidence In This Case

As set forth above, Plaintiff alleges that the continued reporting without noting the dispute harmed her credit reputation, credit rating, and ability to obtain credit, citing to Plaintiff's SOF ¶¶ 23, 24, and 26.  (Doc. 38 at 15-16.)  The evidence does <u>not</u> support Plaintiff's assertions.  In fact, the evidence in the record demonstrates to the contrary—that Plaintiff suffered <u>no</u> negative effects whatsoever from credit reporting the account as "undisputed," and that her credit report was <u>not</u> published to any third-party creditor.  (SUMF ¶¶ 91, 95, 97, 108.)

28

Plaintiff's SOF No. 23 states that on March 1, 2024, "with the assistance of her attorney, Ms. Brady obtained a copy of her Experian credit report."  (Doc. 38 at 6 ¶ 23.)  Plaintiff's SOF No. 24 states that the credit report shows MCM "continued to negatively report the Debts . . . and that MCM failed to note that any of the Debts had been disputed by Ms. Brady."  (Doc. 38 at 7 ¶ 24.)  Plaintiff's SOF No. 26 cites to a case (and only to a case), Evans, 889 F.3d at 345, 349, for the proposition that the failure to report that the Debts were disputed "harmed her credit reputation, impaired her credit rating and her ability to obtain credit."  (Doc. 38 at 7 ¶ 26.)  Thus, Plaintiff has brought forth no *evidence* to suggest that her credit was negatively impacted in any way.  Legal arguments and authority are not evidence.

Instead, Plaintiff testified that she did not apply for credit during the time period that the accounts were being reported as "undisputed" and, thus, was not denied any credit during that time period.  (SUMF ¶ 95.)  Moreover, Plaintiff testified that she is not aware of her credit score being reduced during the credit reporting at issue (even if that is a cognizable injury, which MCM disputes), and that she does not even know what her credit score was during that time period. (SUMF ¶¶ 93, 98.)  Regarding the requirement of publication, Plaintiff has not alleged that her credit report was published to anyone, and her credit report demonstrates that there were no credit inquiries during the relevant time period.  (SUMF ¶ 97.)  In sum, Plaintiff's allegations about damage to her credit have no basis in fact and the Court should determine that they are insufficient to demonstrate an injury.[5]  Llewellyn, 711 F.3d at 1181 (granting summary judgment for defendant

---

[5] In cases such as this, where the plaintiff's case involves putting it graciously, "speculative" injury, courts have questioned the legitimacy of the claims.  In Lemons v. Brewer, No. 23-600, 2024 WL 3571751, *4 (W.D. Okla. July 29, 2024), the plaintiff claimed she suffered intangible harm, which was analogous to defamation, and alleged she suffered "severe" emotional distress.  Yet, plaintiff admitted that she did not suffer any monetary harms, did not seek medical treatment for emotional distress, and that defendant's actions did not result in a lowering of her credit score or a denial of credit.  Id.  Although the court did not impose sanctions on plaintiff, because defendant did not raise the issue in its brief in support of motion for summary judgment, the court found plaintiff's lawsuit "troubling." Id.  Similar facts were before the Court in Brewer v. Portfolio Recovery Assocs., LLC, No. CIV-23-636, 2024 WL 3571754 (W.D. Okla. July 29, 2024).  In that case, the court reiterated its concern about the legitimacy of the claims

where plaintiff failed to point to specific admissible evidence to support his claim that he suffered damages). Because Plaintiff has failed to demonstrate an injury-in-fact, Plaintiff's Motion for Summary Judgment should be denied, and her Complaint dismissed.

### 2. Plaintiff Has Not Established A Tangible Injury

Next, Plaintiff asserts that she has suffered an injury-in-fact because she has experienced a tangible injury due to MCM's credit reporting. (Doc. 38 at 16.) The tangible injury, she asserts, is the "additional time, money, and effort in order to have her attorney send a letter to MCM to re-assert her right to have her credit accurately reflect that she disputed these debts . . . ." (Doc. 38 at 16.) However, the record demonstrates that these asserted tangible injuries are a ruse.

In support of her assertion, Plaintiff cites to two SOF, Nos. 25, 32. (Id.) In SOF No. 25, Plaintiff cites to her "Lawyer Dispute Letter," and her deposition testimony where she discusses her Experian credit report. (Id. (citing Doc. 1-4 and Ex. A at 92:7-94:9).) (Doc. 38 at 7 ¶ 25; Doc. 38-1 at 92:7-94:9.) Plaintiff's SOF No. 32 refers to MCM's process to locate accounts. (Doc. 38 at 8 ¶ 32.) That's it. That is all of the so-called evidence Plaintiff has brought forth to demonstrate a tangible injury.

As to the cases Plaintiff cited, they are inapplicable here where Plaintiff has brought forward no _evidence_ of any money expended, or time and effort spent. First, Plaintiff cites to Walters v. Fast AC, Ltd. Liab. Co., 60 F.4th 642 (11th Cir. 2023), but that case did not hold that the "time and effort" to reassert plaintiff's rights on its own is sufficient to confer standing. Rather, the plaintiff in Walters testified that the issue impacted his credit score and prevented him from purchasing a truck and from refinancing his home. Id. at 646-47. Also, plaintiff testified that he

---

and determined that plaintiff did not show any injury in fact and that his FDCPA claim must be dismissed for lack of Article III standing. Id. at **2, 2 n.5.

spent money faxing documents to his attorney to try and resolve the debt that he asserted he did not owe.  Id. at 647; compare, Gilbert v. TrueAccord Corp., 608 F. Supp. 3d 656, 664 (N.D. Ill. 2022) (holding that the time spent consulting or hiring an attorney will not confer standing).

Next, Plaintiff cites to Mack v. Resurgent Cap. Servs., L.P., 70 F.4th 395, 407 (7th Cir. 2023), but that case is distinguishable because the evidence before the court was that plaintiff (herself) drafted a letter by hand, went to the library to type the letter into the library computer, printed it, and returned to the post office "where she once again paid for postage and a certified letter fee (this time totaling $3.95) . . . ." Id. at 400.  Plaintiff has not presented any facts like those before the Court in Mack.  There is no evidence in the record as to any payments Plaintiff incurred for postage, nor is there evidence of any efforts that Plaintiff herself undertook.  (SUMF ¶¶ 56-58, 89, 97, 99, 100-03.)

Plaintiff also cites to an In re Mack case, but only provides a Lexis citation without the case number.  Presumably, the case to which Plaintiff refers is In re Mack, No. 24-8021, 2024 WL 4799320, at *1 (7th Cir. Nov. 12, 2024).  In that case, the court did not address "time and energy spent," as Plaintiff asserts, but rather granted a petition for permission to appeal and remanded the case with the following (inapposite) observations: "[f]irst, in Mack v. Resurgent Capital Services, L.P., 70 F.4th 395 (7th Cir. 2023), we did not hold that monetary harm is the only way to establish standing in this case"; and "[s]econd, a plaintiff 'need not prove that every member of the proposed class has been harmed before the class can be certified.'  Bell v. PNC Bank, N.A., 800 F.3d 360, 380 (7th Cir. 2015)."  In re Mack, 2024 WL 4799320, *1.

In sum, the case law does not support that Plaintiff's feigned "time, money and effort" is sufficient to demonstrate a tangible injury.

### 3.      Plaintiff Has Not Demonstrated Causation

Article III standing is also lacking in this case for the reason that even if Plaintiff could come forward with some cognizable "injury," there is no evidence that the "injury" was caused by the less-than-three-month credit reporting at issue.  Causation for purposes of standing looks at whether a <u>defendant</u>—rather than some other party—was the but-for cause of the alleged injury. <u>See</u> <u>Santa Fe All. for Pub. Health & Safety v. City of Santa Fe, New Mexico</u>, 993 F.3d 802, 814 (10th Cir. 2021) ("a plaintiff must establish that its injury was 'not the result of the independent action of some third party not before the court.'"); <u>Habecker v. Town of Estes Park, Colo.</u>, 518 F.3d 1217, 1225 (10th Cir. 2008) (holding plaintiff failed to show that his asserted injury—his recall from office—was fairly traceable to defendant's action as plaintiff's "ultimate removal from office" was accomplished via votes by third parties not before the court, and the court could not presume the voters' decision was connected to defendant).

Here, not only is there no injury, but there is no evidence that the phantom injury was caused by MCM failing to report that Plaintiff's accounts were "disputed."  In other words, Plaintiff must show a specific and recognizable injury, and then show that said injury was caused by her credit being briefly reported as "undisputed" when it should have been marked as "disputed."  She has produced no evidence to support causation, nor does the position even pass the smell test.  Standing is lacking on this basis as well.

### B.      MCM Did Not Know, Nor Should It Have Known, Of Plaintiff's Disputes

Section 1692e(8) prohibits a debt collector from "[c]ommunicating . . . to any person credit information which is known or which should be known to be false, including the failure to communicate that a disputed debt is disputed."  15 U.S.C. § 1692e(8).  There is no evidence that MCM *knew* that the credit information it was reporting was false.  Instead, MCM did not notate

the Debts as disputed because, after numerous attempts, it could not locate Plaintiff's accounts based on the January 11 Letters.  (SOF ¶¶ 38, 45; SUMF ¶¶ 66-69, 84.)

MCM also challenges that it should have known about Plaintiff's disputes based on the January 11 Letters.  The Seventh Circuit recently determined that the "which should be known" language in Section 1692e(8) creates a negligence standard.  Wood v. Sec. Credit Servs., LLC, No. 23-2071, 2025 WL 314383, at *6 (7th Cir. Jan. 28, 2025).  The court held that Section 1692e(8) "holds debt collectors to a duty of reasonable care not to report false information, which would be typical for a negligence standard."  Id.

The question here is whether MCM used reasonable care to attempt to associate the January 11 Letters to Plaintiff's accounts.  The record demonstrates that it did.  To begin with, there is no dispute that when the SOD team[6] receives correspondence, it attempts to match the correspondence to accounts in MCM's system; had MCM known about the disputes, it would have marked the Debts as disputed.  (SUMF ¶¶ 50-51, 84.)  Moreover, the undisputed evidence demonstrates that MCM received the January 11 Letters, and they were provided to MCM's SOD team to review and process.  (SOF ¶¶ 36-38; SUMF ¶¶ 66-67.)  Between January 24 and January 30, 2024, the SOD team followed its policies and procedures and attempted to match the January 11 Letters with the Debts to no avail.  (SOF ¶¶ 38-40; SUMF ¶ 69.)

The record also demonstrates that the SOD team was not able to associate the January 11 Letters with the Debts until after Plaintiff's counsel sent the March 22 Letter.  (SUMF ¶¶ 68-69.)  The SOD team's efforts to associate the January 11 Letters to the Debts may have been stymied for numerous reasons, including by the language of the January 11 Letters, which Plaintiff's

---

[6] Plaintiff continually references that the employees were "in India," (e.g., SOF ¶¶ 27-30, 38, 42, 46), but it is unclear why the location of the employees or their national origin is relevant.

counsel drafted, and the fact that the January 11 Letters were sent separately. (SUMF ¶¶ 70-76, 79, 81(a)-(o).) Indeed, the January 11 Letters did not include Plaintiff's SSN, or even part of it, her date of birth, or any part of the original account numbers. (SUMF ¶¶ 70-74.) None of the letters correctly identified a complete nine-digit MCM Account Number, which Plaintiff had provided to her counsel, and one of the letters included a totally incorrect partial MCM Account Number. (SUMF ¶¶ 59-62, 73-74.) Moreover, the street addresses that counsel provided for Plaintiff in the January 11 Letters was not identical to the address MCM had in its records, and the consumer name provided in the letters was also different. (SUMF ¶¶ 63-65, 81(a)-(e).) Further complicating MCM's attempt to match the January 11 Letters to the Debts, Plaintiff's counsel chose to provide three separate letters for the accounts rather than include the disputes in one letter or at least include them all in one envelope so they could be processed together. (SUMF ¶ 58.) The decision to mail three separate letters is curious, to say the least.

Thus, based on the undisputed evidence that MCM's SOD team attempted on numerous occasions to associate the January 11 Letters to the Debts, and due to the language of those letters (or lack thereof) and method of transmission (three separate letters), Plaintiff *cannot* establish that MCM breached its duty of reasonable care not to report false information. As such, Plaintiff cannot demonstrate that MCM violated Section 1692e(8).

C.    **Assuming *Arguendo* That The Court Determines Plaintiff Established Article III Standing And A Violation of Section 1692e(8), MCM Is Entitled To The Bona Fide Error Defense**

Even if Plaintiff can establish standing and establish that there is a violation of Section 1692e(8), the Court should determine that MCM is not liable because it is entitled to the bona fide error defense set forth in 15 U.S.C. § 1692k(c). MCM addressed its bona fide error defense in its Motion for Summary Judgment (Docs. 35, 36) and incorporates that briefing herein by reference.

(Doc. 36 at 19-22.)  However, MCM's response to Plaintiff's argument that the bona fide error defense does not apply to MCM's alleged violation is set forth below.

### 1.    Intentionality

Plaintiff asserts that MCM cannot establish that the error was unintentional because it has not brought forward testimony from a fact witness.  (Doc. 38 at 18-19.)  For the proposition that MCM is required to present "fact witness testimony," Plaintiff cites to two out-of-circuit district court cases that did not concern the bona fide error defense and are inapplicable.  Before the court in Sherman v. Sheffield Fin., LLC, 338 F.R.D. 247, 250 (D. Minn. 2021), was the defendant's motion for protective order to preclude certain depositions.  Before the court in Calderon v. Experian Info. Sols., Inc., 290 F.R.D. 508, 510 (D. Idaho 2013), was defendant's objection to the magistrate's order regarding discovery.  As Plaintiff noted, both of those cases concerned the Fair Credit Reporting Act.  Thus, those cases do not speak to the intent prong of the bona fide error defense (or to any part of the bona fide error defense).

Moreover, as to this first prong, MCM has brought forth testimony that it did not intend to violate the FDCPA (if it did) by reporting the Debts as undisputed after Plaintiff's counsel sent the January 11 Letters to MCM.  (SUMF ¶¶ 84-85.)  MCM is allowed to present its position through the testimony of a corporate representative.  See Brazos River Auth. v. GE Ionics, Inc., 469 F.3d 416, 434 (5th Cir. 2006) (holding that if certain facts are within the collective knowledge or subjective belief of the company, the corporate representative is allowed to testify as to those facts, even if it is not within his direct personal knowledge).  Indeed, that is how corporate entities speak. This testimony is enough to satisfy the intent prong, which is a subjective test.  Johnson v. Riddle, 443 F.3d 723, 728-29 (10th Cir. 2006) (holding that "a violation is unintentional for purposes of the FDCPA's bona fide error defense if the debt collector can establish the lack of specific intent

to violate the Act."); <u>Buvaylik v. Portfolio Recovery Assocs., LLC</u>, No. 18-251, 2022 WL 300963, at *4 (N.D. Okla. Jan. 31, 2022).

In fact, Plaintiff does not dispute that the SOD team attempted on numerous occasions to associate the January 11 Letters with the Debts but could not. (SOF ¶ 38.) Moreover, MCM testified that if MCM had been able to associate the January 11 Letters to the Debts, it would have modified the credit reporting of the Debts to "undisputed," and the only reason that it continued to credit report the Debts as undisputed after receipt of the January 11 Letters was that, despite following its process and procedures, it was unable to associate those letters with the Debts. (SUMF ¶ 66-69, 84.)

Simply put, the record clearly demonstrates a lack of specific intent to violate the FDCPA, and that is all that is required to establish the first prong of the defense. <u>Anchondo v. Anderson, Crenshaw & Assocs., L.L.C.</u>, 256 F.R.D. 661, 671 (D.N.M. 2009) (holding that "a violation is unintentional for purposes of the FDCPA's bona fide error defense if the debt collector can establish the lack of specific intent to violate the Act," quoting <u>Johnson</u>, 443 F.3d at 728).

## 2. Good Faith

Plaintiff seems to suggest that the error was not "bona fide" because MCM did not identify what error or errors occurred, and because it has not offered any witnesses or supporting documents as to what it claims went wrong. (Doc. 38 at 19.) This misstates the showing required for this prong of the test.

The second prong of the test "imposes an objective standard of reasonableness upon the asserted unintentional violation." <u>Leichliter v. Optio Sols., LLC</u>, 672 F. Supp. 3d 1165, 1173 (W.D. Okla. 2023) (cleaned up) (quoting <u>Johnson</u>, 443 F.3d at 729). In making this determination, courts have applied the "traditional definition of 'made in good faith; inadvertently; without fraud or deceit' and 'faithfulness to one's duty or obligation.'" <u>Caputo v. Pro. Recovery Servs., Inc.</u>,

261 F. Supp. 2d 1249, 1257 (D. Kan. 2003) (internal citations omitted). Of course, here, the asserted error that occurred was that MCM did not change the credit reporting of the Debts to "disputed" upon receipt of the January 11 Letters. MCM need not catalogue why it could not associate the January 11 Letters with the Debts (even though it has listed the possible reasons why; see infra) but, rather, must demonstrate that it acted inadvertently, without fraud or deceit, which it did. Moreover, the evidence demonstrates that to the extent that MCM erred by failing to report the Debts as disputed, it only did so because it was unable to associate the January 11 Letters to the Debts, which it attempted to do. (SUMF ¶¶ 66-69, 84-87.)

Indeed, the record is undisputed that MCM's SOD team did not, in fact, associate the January 11 Letters with Plaintiff's accounts. (SUMF ¶ 79.) It tried but could not. Primarily constraining the search was the fact that Plaintiff's counsel mailed the three letters separately. (SUMF ¶ 79.) This decision caused the January 11 Letters to be analyzed independently by various members of the SOD team. (SUMF ¶ 58.)

Further compounding the SOD team's efforts was the incomplete and inaccurate information contained in the separate letters. (SUMF ¶¶ 70-76, 81(a)-(o).) Specifically, none of the January 11 Letters included a complete account number (either the original creditor's account number or an MCM Account Number). (SUMF ¶¶ 72-74, 76, 81(i)-(k), (m).) None of the January 11 Letters included Plaintiff's SSN or her DOB. (SUMF ¶¶ 81(g)-(h).) One of the January 11 Letters even included a wholly incorrect partial account number. (SUMF ¶ 81(k).) Moreover, the address identified in the January 11 Letters was slightly different than the address MCM had in its DM System. (SUMF ¶ 81(d)-(e).) Plaintiff's name also varied slightly. (SUMF ¶¶ 81(a)-(c).) These factors compounded the primary barrier to matching—separate letters. (SUMF ¶¶ 79, 81(a)-(m).)

Once Plaintiff's counsel provided MCM with a letter identifying all three accounts in the same letter, MCM was able to locate the Debts and changed its reporting to "disputed." (SUMF ¶¶ 79-80, 94.) This fact is also undisputed. At all times, MCM acted in good faith. (E.g., SUMF ¶ 86.)

### 3. Procedures

Finally, Plaintiff challenges the third prong, asserting that MCM cannot demonstrate it maintained procedures reasonably adapted to avoid any such error, and she also seems to assert that the policies were not reasonably adapted to avoid the error. (Doc. 38 at 20.) The undisputed facts do not support Plaintiff's arguments.

First, as to the maintenance (i.e., actually employed or implemented) of reasonable procedures to avoid violating the FDCPA in these circumstances, MCM has detailed procedures for receipt of correspondences and a dedicated team to review and process those documents. (SUMF ¶¶ 49-54.) Here, it followed its procedures. The record in this case demonstrates that for correspondences that do not include a valid MCM Account Number, the SOD team is required to search for matching information using data such as the consumer's name, SSN, original account number, and telephone number. (SOF ¶ 52.) The evidence in this case demonstrates that Plaintiff's name in the January 11 Letters did not match the name MCM had in its system, and that Plaintiff did not provide her SSN, original account number or her telephone number. (SUMF ¶¶ 63-65, 81(a)-(l).) Thus, pursuant to MCM's policies, the January 11 Letters were placed in MCM's UFA. (SUMF ¶¶ 53, 68.)

The record also demonstrates that four separate employees on MCM's SOD team reviewed the January 11 Letters. These reviews occurred on January 24, 2024, January 25, 2024, January 26, 2024, and January 30, 2024, in an attempt to associate those letters to accounts. (SUMF ¶ 69) Thus, the evidence demonstrates that MCM "implemented" and "employed" its procedures.

Second, regarding whether the procedures were "reasonably adapted" to avoid the error at issue, they were. The record is clear that MCM has processes that have orderly steps to attempt to locate correspondences with accounts. Where correspondences do not have a valid MCM Account Number, which undisputedly the January 11 Letters did not, there are specified pieces of information that the SOD team must review. (SOF ¶ 27.) If that yields no match, the procedures require that three separate MCM employees review the correspondence for three consecutive days, followed by a final attempt on the seventh working day by another employee. (SOF ¶ 32.)

Plaintiff takes issue with the procedures because they do not require the employees to use "a wildcard search," search a separate database called "Salesforce" to locate the consumer by name, or use a tool called "Credit Browser." (Doc. 38 at 8.) Plaintiff misunderstands what this element requires and MCM's procedures.

The Tenth Circuit has determined that "procedures are processes that have mechanical or other such regular, orderly steps to avoid mistakes." Lupia, 8 F.4th at 1197 n.5 (cleaned up) (quoting Jerman, 559 U.S. at 587). Regarding what this element requires, it requires that the procedures be "reasonable," not perfect. Neeley v. Express Recovery Servs., No. 10-604, 2012 WL 1641198, at *2 (D. Utah May 9, 2012) (holding that "[t]he Defendant is not required to show the policies and procedures were perfect, only that they show reasonable precaution."). MCM need not take "every conceivable precaution to avoid errors; rather, it must take "reasonable precaution." Kort v. Diversified Collection Servs., Inc., 394 F.3d 530, 539 (7th Cir. 2005).

Plaintiff's assertion that a "wildcard" search should be required, it would likely not have aided the SOD team in this case, as the wildcard search (using an asterisk in a first name, last name, or address) would not have yielded any definitive results due to the way "Cynthia" and "Cindy" are spelled (SUMF ¶¶ 81(n)-(o)) and because Brady is a common name. Regarding the

39

address, a wildcard search where there is an apartment number, which was the situation in this case, would produce multiple "hits for the address with or without the apartment number," for example, if there were 100 units.  (Canez Dep. 43:25-44:10.)

Regarding use of "Salesforce," that is not a separate searchable data base, as Plaintiff contends (Doc. 38 at 8 ¶ 29), rather it is the database where the correspondences are housed, and the policy that MCM produced states that the policy "will assist the consumer support services, CSS, start of day, SOD team in preparing correspondence files for Salesforce ingestion and case creation."  (Canez Dep. 40:1-4.)

Regarding "Credit Browser," that is a search engine and is used if an account is located but additional information is required.  (Doc. 46 at 7.)  Here, no accounts were located.  (SUMF ¶ 69.)  Thus, Credit Browser would not have aided the SOD team in their search.

In sum, the procedures were reasonable.  See Sires v. Midland Credit Mgmt., Inc., No. 23-00583, 2024 WL 2274083, at *9 (D. Colo. May 20, 2024) (holding that this element was satisfied where defendant presented specific, uncontroverted evidence that it actually employed and implemented the requisite reasonable procedures).  MCM's written procedure has regular, orderly steps (including, but not limited to, making a backup of every file that is received, indexing the files, moving the backup files to specified locations, searching for accounts that do not include a valid MCM Account Number (such as in this case), naming the files, and how often and when searches must be conducted).  (SUMF ¶¶ 49-54; SOF ¶ 37-39.)  Thus, this element is satisfied and MCM is entitled to the bona fide error defense.

## IV.    CONCLUSION

MCM respectfully requests that the Court deny Plaintiff's Motion and dismiss the Complaint for lack of Article III standing or, alternatively, issue summary judgment for MCM.

DATED this 21st day of February, 2025.

                Respectfully submitted,

                SPENCER FANE LLP

By: s/ Joshua C. Dickinson
                Joshua C. Dickinson       KS Bar No. 20632
                1000 Walnut, Suite 1400
                Kansas City, MO 64106
                Telephone: (816) 474-8100
                Facsimile: (816) 474-3216
                E-mail: jdickinson@spencerfane.com

                Shilee T. Mullin, #52207 MO
                13815 FNB Parkway, Suite 200
                Omaha, NE 68154
                Telephone: (402) 965-8600
                Facsimile: (402) 965-8601
                E-mail: smullin@spencerfane.com

                ATTORNEYS FOR DEFENDANT

## CERTIFICATE OF SERVICE

I hereby certify that the foregoing document was filed electronically with the United States District Court for the District of Kansas this 21st day of February, 2025, with notice of case activity generated and sent to counsel of record.

                s/ Joshua C. Dickinson