## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF KANSAS

| | |
|---|---|
| **CYNTHIA BRADY,** | |
| **Plaintiff,** | |
| **v.** | **Case No. 24-2110-JAR** |
| **MIDLAND CREDIT MANAGEMENT, INC.,** | |
| **Defendant.** | |

## MEMORANDUM AND ORDER

Plaintiff Cynthia Brady brings this claim under the Fair Debt Collection Practices Act[1] ("FDCPA") against Defendant Midland Credit Management, Inc. ("Midland Credit").  She alleges that Midland Credit violated its duty under 15 U.S.C. § 1692e(8) not to use false, deceptive, or misleading means to collect a debt when it failed to report her debts as disputed to credit-reporting agency Experian.  Midland Credit first counters that Brady lacks standing to bring the claim; it also raises the bona fide error defense under § 1692k(c).  Before the Court are Midland Credit's Motion for Summary Judgment (Doc. 35), asking the Court to dismiss the case for lack of standing, or alternatively, to grant summary judgment on its bona fide error defense, and Brady's Cross Motion for Summary Judgment (Doc. 38) on her claim and on Midland Credit's bona fide error defense.  The motions are fully briefed, and for the reasons explained below, the Court denies both motions.

### I.  Summary Judgment Standard

Summary judgment is appropriate if the moving party demonstrates that there is no

---

[1] Fair Debt Collection Practices Act, 15 U.S.C. §§ 1692–1692p.

genuine dispute as to any material fact and that it is entitled to judgment as a matter of law.  In applying this standard, a court views the evidence and all reasonable inferences therefrom in the light most favorable to the nonmoving party.[2]  "There is no genuine issue of material fact unless the evidence, construed in the light most favorable to the non-moving party, is such that a reasonable jury could return a verdict for the non-moving party."[3]  A fact is "material" if, under the applicable substantive law, it is "essential to the proper disposition of the claim."[4]  An issue of fact is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the non-moving party."[5]

     When the nonmoving party will bear the burden of persuasion at trial, the moving party initially must show the absence of a genuine issue of material fact and entitlement to judgment as a matter of law.[6]  Once the movant has met this initial burden, the burden shifts to the nonmoving party to "set forth specific facts showing that there is a genuine issue for trial."[7]  The nonmoving party may not simply rest upon its pleadings to satisfy its burden.[8]  Rather, the nonmoving party must "set forth specific facts that would be admissible in evidence in the event of trial from which a rational trier of fact could find for the nonmovant."[9]  To accomplish this, the facts "must be identified by reference to an affidavit, a deposition transcript[,] or a specific

---

[2] *City of Harriman v. Bell*, 590 F.3d 1176, 1181 (10th Cir. 2010).

[3] *Bones v. Honeywell Int'l, Inc.*, 366 F.3d 869, 875 (10th Cir. 2004).

[4] *Wright ex rel. Trust Co. of Kan. v. Abbott Labs., Inc.*, 259 F.3d 1226, 1231–32 (10th Cir. 2001) (citing *Adler v. Wal-Mart Stores, Inc*., 144 F.3d 664, 670 (10th Cir. 1998)).

[5] *Thomas v. Metro. Life Ins.*, 631 F.3d 1153, 1160 (10th Cir. 2011) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)).

[6] *Spaulding v. United Transp. Union*, 279 F.3d 901, 904 (10th Cir. 2002) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 323–24 (1986)).

[7] *Anderson*, 477 U.S. at 256.

[8] *Id.*; accord *Eck v. Parke, Davis & Co.*, 256 F.3d 1013, 1017 (10th Cir. 2001).

[9] *Mitchell v. City of Moore*, 218 F.3d 1190, 1197–98 (10th Cir. 2000) (quoting *Adler v. Wal-Mart Stores, Inc*., 144 F.3d 664, 671 (10th Cir. 1998)).

exhibit incorporated therein."[10]  The nonmoving party cannot avoid summary judgment by repeating conclusory opinions, allegations unsupported by specific facts, or speculation.[11]

When, on the other hand, the movant seeks summary judgment on its own affirmative defense—on which it will bear the burden of persuasion at trial—the defendant must "demonstrate that no disputed material fact exists regarding the affirmative defense asserted."[12] And that showing must be sufficient to "entitle [the movant] to a directed verdict if not controverted" at trial.[13]  Once the defendant makes this initial showing, "the plaintiff must then demonstrate with specificity the existence of a disputed material fact."[14]  If the plaintiff cannot meet this burden, "the affirmative defense bars [her] claim, and the defendant is then entitled to summary judgment as a matter of law."[15]

Finally, summary judgment is not a "disfavored procedural shortcut"; on the contrary, it is an important procedure "designed 'to secure the just, speedy and inexpensive determination of every action.'"[16]  In responding to a motion for summary judgment, "a party cannot rest on ignorance of facts, on speculation, or on suspicion and may not escape summary judgment in the mere hope that something will turn up at trial."[17]

---

[10] *Adams v. Am. Guar. & Liab. Ins. Co.,* 233 F.3d 1242, 1246 (10th Cir. 2000).

[11] *Argo v. Blue Cross & Blue Shield of Kan., Inc.,* 452 F.3d 1193, 1199 (10th Cir. 2006).

[12] *Estrada v. Smart,* 107 F.4th 1254, 1261 (10th Cir. 2024) (quoting *Hutchinson v. Pfeil,* 105 F.3d 562, 564 (10th Cir. 1997)).

[13] *Brown v. Perez,* 835 F.3d 1223, 1231 (10th Cir. 2016); *see also* 11 Jeffrey W. Stempel and Steven S. Gensler, *Moore's Federal Practice* § 56.40 (3d ed. 2018) ("When the movant bears the burden of persuasion at trial, the movant must produce evidence that would conclusively support its right to a judgment after trial *should the nonmovant fail to rebut the evidence*." (emphasis added)); *Leone v. Owsley,* 810 F.3d 1149, 1153 (10th Cir. 2015) (noting that party's showing "must be sufficient for the court to hold that no reasonable trier of fact could find other than for the moving party").

[14] *Hutchinson,* 105 F.3d at 564.

[15] *Id.*

[16] *Celotex,* 477 U.S. at 327 (quoting Fed. R. Civ. P. 1).

[17] *Conaway v. Smith,* 853 F.2d 789, 794 (10th Cir. 1988).

## II.  Uncontroverted Facts

The following facts are either uncontroverted or stipulated to in the Pretrial Order.[18]

Midland Credit is a debt collector that owns three defaulted debts owed by Cynthia Brady.  Midland Credit acquired these debts from Brady's former creditors: two accounts came from Synchrony Bank, and one account came from Comenity Capital Bank.  And after the debts remained unpaid, Midland Credit began reporting those debts as undisputed and in "active collections" to credit-reporting agency Experian.  It reported them to Experian as undisputed debts from January 11, 2024, until March 28, 2024.

But in fact Brady had disputed those debts.  On January 11, 2024, she mailed three letters—one for each debt—to Midland Credit.  In each letter she identified the debt amount, the original creditor, and the last four digits of the account number.[19]  Then she explained that she "dispute[d] this debt and d[id] not want to be contacted about it by [Midland Credit]."[20]  Each letter also included her full address, and she signed the letters "Cynthia Brady."

Midland Credit received those letters.  But it could not associate the letters with Brady's accounts, so it did not mark the debts as disputed.  This is Midland Credit's typical association process.  When a consumer mails a dispute letter to Midland Credit, a team of Midland Credit employees sets about processing that mail, and that same team attempts to associate the letters with their proper accounts.  Midland Credit has guidelines for the association process, and those guidelines instruct Midland Credit's employees to use the information provided in the letters to identify the relevant account.  The most distinctive identifier for an account—and indeed the first thing to look for in the associating process—is the full account number that Midland Credit

---

[18] Doc. 34.

[19] Doc. 1-2 at 1, 3, 5.

[20] *Id.*

4

assigns to the account.  If the letter includes a full account number, then Midland Credit can easily associate the letter to its account.  But Brady did not include a full account number for any of her accounts in her letters.  Although Midland Credit included Brady's account numbers in all its correspondence with her, Brady's January letters included only partial account numbers—the last four digits of each number.  And in fact, one of those partial numbers was apparently incorrect and matches no Midland Credit account.

So Midland Credit employees could not rely on full account numbers to associate the January letters; they needed to use the next-best information contained in the letters.  Midland Credit's guidelines cover this situation, too.  When a letter does not include a full account number, the associating team tries to use whatever information the letter contains, like the consumer's name, Social Security number, full or partial address, the account number assigned by the original creditor, and phone number.  If a letter does not contain that information, or the available information is insufficient to associate the letter to an account, the team member places the letter in a folder designated "UFA—Unable to Find Account."[21]

Of that next-best information, the January letters included only Brady's name ("Cynthia Brady") and her full address, which included a street named "Terrace."[22]  The letters did not contain her Social Security number, phone number, or the original creditor's account numbers.  But even the information contained in the letters did not guarantee a match in Midland Credit's system.  That is because Brady's name is identified in Midland Credit's system as "Cindy Brady," not "Cynthia Brady,"[23] and a search for an account in the name of "Cynthia Brady"

---

[21] Doc. 37-2, Canez Dep. 46:20–47:12.

[22] Doc. 1-2 at 1, 3, 5; Doc. 37-2, Canez Dep. 42:21–43:19.

[23] "Cindy Brady" became the name on the accounts in October 2021 when Midland Credit acquired the Comenity debt.  Doc. 38-2, Canez. Dep. 29:16–31:9, 89:14–90:4.  When Midland acquired them, two of the three accounts listed her as "Cindy Brady"; one listed her as "Cynthia Brady."  *Id.* at 90:5–19.

would not have returned a result for accounts associated with "Cindy Brady." And Midland

Credit's records show her street address as "TER," not "Terrace."[24] So after Midland Credit's

employees followed at least some search procedures[25] and still found no matching account, the

January letters were placed in the UFA folder.

Midland Credit's associating guidelines address this issue, too. Correspondence in the

UFA folder receives a review by several different team members over a seven-day period. And

if after seven days no team member associates the letter with an account, the letter remains

indefinitely in the UFA folder. Several separate team members reviewed the January letters and

attempted to associate them with an account on four different occasions. But to no avail: the

letters remained unassociated, so they remained in the UFA folder. And because Midland Credit

could not associate the letters with Brady's account, it did not switch the reporting designation of

---

[24] The original creditors' account information listed Brady's address with the street "TER," (short for "terrace"), which Midland Credit incorporated into its own account information. So Midland Credit's system listed Brady's street as "TER."

[25] Brady purports to controvert that Midland Credit employees followed internal procedures when attempting to associate the January letters. Midland Credit's corporate representative Bernadette Canez testified at her deposition that the account representatives "followed . . . policy and procedure guidelines . . . when handling the first set of letters [i.e., the January letters]." Doc. 37-2, Canez Dep. 17:12–20. She then confirmed that the file names of those letters bore the name of each account representative who attempted to associate the letter to an account. *Id.* at 83:20–84:12. Brady argues that Canez, being a corporate representative, had no personal knowledge of what steps the account representatives took and only stated what steps the representatives might have taken. But Brady's argument misunderstands the role of a Rule 30(b)(6) corporate representative, whose testimony comes from the organization's knowledge, not personal knowledge. *See Lawson v. Spirit Aero Sys., Inc.*, No. 18-1100-EFM-ADM, at *6 (D. Kan. Mar. 18, 2020) ("A deposition of an individual is designed to elicit personal knowledge whereas a corporate representative must 'testify about information known or reasonably available to the organization.'" (quoting Fed. R. Civ. P. 30(b)(6))). And in any event, the assertion is flatly contradicted by Canez's testimony that the representatives followed internal policy for the letters. Moreover, Brady's evidence offered to controvert this fact is inapposite. It discusses reasons why the representatives would have been unable to associate the account with the letters, *see, e.g.*, Doc. 37-2, Canez Dep. 93:20–95:6 (explaining several reasons why the account could not be associated with the letter based on the information provided), and that Canez did not have evidence that the representatives conducted a "wild card search." *Id.* at 42:16–20. But neither of those address whether the representatives followed at least some standard internal policies. Brady, therefore, has not genuinely disputed Midland Credit's factual assertion that Midland Credit's employees followed at least some of its search procedures when processing the January letters.

her debts from undisputed to disputed.  Midland Credit thus continued reporting the debts as undisputed to Experian.

That changed in March 2024 after Brady sent another dispute letter.  This correspondence differed from the January letters: this single letter came in the form of a demand letter from her attorney, which demanded that Midland Credit "stop reporting th[e] debts without noting that they are disputed."[26]  This single March letter included the last four digits of *each* account number, unlike the several January letters, so this time, Midland Credit considered all the account information in the March letter together.  Midland Credit successfully associated the letter to Brady's accounts.

Brady mailed that March letter on March 22, 2024.  Three days later, Brady filed this suit against Midland Credit.  And Midland Credit stopped reporting Brady's debts as undisputed around March 28, 2024.  So all told, Midland Credit reported the debts as undisputed to Experian for around two-and-a-half months—January 11, 2024, to March 28, 2024.  During that time, Brady did not notice a drop in her credit score.  And she knows of no potential creditors who checked her Experian credit report during that time period.

## III. Discussion

Midland Credit seeks victory through two avenues.  First, it argues that the Court should grant it summary judgment on Brady's claim because she lacks Article III standing since she suffered no injury-in-fact and cannot show causation.  Second, it argues that it is entitled to summary judgment on its bona fide error defense.  Brady has her own path to victory: she moves for summary judgment both on her claim and on Midland Credit's affirmative defense.  The Court first addresses Brady's standing to bring the claim.  And concluding that she has standing,

---

[26] Doc. 1-4 at 1.

the Court next considers her § 1692e(8) claim, and then addresses Midland's bona fide error defense.

### A. Standing

Midland Credit argues that Brady lacks standing to pursue her claim because she did not suffer a concrete injury, and even if she did, Midland Credit's conduct did not cause it. Article III of the United States Constitution confers on federal courts "[t]he judicial Power of the United States."[27] And that power extends only to deciding a "case" or "controversy."[28] As the Supreme Court has explained, "[i]n limiting the judicial power to 'Cases' and 'Controversies,' Article III of the Constitution restricts it to the traditional role of Anglo-American courts, which is to redress or prevent actual or imminently threatened injury to persons caused by private or official violation of law. Except when necessary in the execution of that function, courts have no charter to review and revise legislative and executive action."[29]

One of several doctrines reflecting Article III's case-or-controversy limitation on the judicial power is the doctrine of standing. That doctrine requires federal courts, before considering the merits of an action, to "satisfy themselves that the plaintiff has alleged such a personal stake in the outcome of the controversy as to warrant [the plaintiff's] invocation of federal-court jurisdiction."[30] Brady, as the party invoking federal jurisdiction, bears the burden of establishing each element of standing "with the manner and degree of evidence required at the

---

[27] U.S. Const. art. III, § 1; *Spokeo, Inc. v. Robins*, 578 U.S. 330, 337 (2016).

[28] U.S. Const. art. III, § 2; *Raines v. Byrd*, 521 U.S. 811, 818 (1997) ("[T]he federal courts have jurisdiction over this dispute . . . only if it is a 'case' or 'controversy.'" (quoting U.S. Const. art. III, § 2)).

[29] *Summers v. Earth Island Inst.*, 555 U.S. 488, 492 (2009).

[30] *Id.* at 493 (quoting *Warth v. Seldin*, 422 U.S. 490, 498–99 (1975)).

successive stages of the litigation."[31]  The Supreme Court has found the "irreducible

constitutional minimum of standing" to contain three elements:

> First, the plaintiff must have suffered an "injury in fact"—an
> invasion of a legally protected interest which is (a) concrete and
> particularized, and (b) actual or imminent, not conjectural or
> hypothetical.  Second, there must be a causal connection between
> the injury and the conduct complained of—the injury has to be
> "fairly . . . trace[able] to the challenged action of the defendant,
> and not . . . th[e] result of the independent action of some third
> party not before the court."  Third, it must be "likely," as opposed
> to merely "speculative," that the injury will be "redressed by a
> favorable decision."[32]

An injury in fact must be particularized—that is, "it 'must affect the plaintiff in a

personal and individual way.'"[33] And it must also be concrete—it "must be '*de facto*' . . . it must

actually exist."[34]  Courts assess a harm's concreteness by considering whether the "alleged injury

to the plaintiff has a 'close relationship' to a harm 'traditionally' recognized as providing a basis

for a lawsuit in American courts."[35]  That inquiry calls for a court to consider whether plaintiff's

alleged injury has "a close historical or common-law analogue."[36]  So even though Congress

may "elevate" harms "to the status of legally cognizable injuries," the harm must still be a de

facto harm.  Thus, even though Congress has, through § 1692e(8), elevated a "failure to

---

[31] *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561 (1992); *Tandy v. City of Wichita*, 380 F.3d 1277, 1284 (10th Cir. 2004).

[32] *Lujan*, 504 U.S. at 560–61 (internal quotation marks and citations omitted).

[33] *Spokeo, Inc. v. Robins*, 578 U.S. 330, 339 (2016) (quoting *Lujan*, 504 U.S. at 560 n.1).

[34] *Id.* at 340.

[35] *TransUnion LLC v. Ramirez*, 594 U.S. 413, 425 (2021) (quoting *Spokeo*, 578 U.S. at 341).

[36] *Id.*

communicate" that a debt is disputed to a legally cognizable injury,[37] that failure must still carry some concrete injury before plaintiff has standing to sue.[38]

Concrete injuries divide into two broad categories: tangible and intangible.  Concrete tangible injuries are those quintessential injuries giving rise to lawsuits—physical harm or pocketbook injuries.[39]  But intangible injuries can be concrete, too,[40] so long as they are "injuries with a close relationship to harms traditionally recognized as providing a basis for lawsuits in American courts."[41]  *TransUnion LLC v. Ramirez* identified some examples of concrete intangible harms: "reputational harms, disclosure of private information, and intrusion upon seclusion."[42]

Here, Brady focuses on the first example—reputational harm.  The crux of the parties' dispute is whether Brady suffered reputational harm sufficient to give rise to a concrete intangible injury when Midland Credit reported her debts to Experian as undisputed.  Brady characterizes her injury as a reputational harm and identifies its common-law analogue as the common-law tort of defamation.  Defamation remedies reputational harm occurring from "a defamatory statement 'that would subject [a person] to hatred, contempt, or ridicule' [being] published to a third party.'"[43]  So to rise to the level of the reputational harm remedied by

---

[37] 15 U.S.C. § 1692e(8).

[38] *See Spokeo*, 578 U.S. at 341 ("Congress' role in identifying and elevating intangible harms does not mean that a plaintiff automatically satisfies the injury-in-fact requirement whenever a statute grants a person a statutory right and purpose to authorize that person to sue to vindicate that right.").

[39] *Id.* at 425 (explaining that "tangible harms" like "physical harms and monetary harms" "readily" satisfy the concreteness requirement).

[40] *Lupia v. Medicredit, Inc.*, 8 F.4th 1184, 1191 (10th Cir. 2021) (citing *Spokeo*, 578 U.S. at 340).

[41] *Id.* (explaining that such injuries are "chief among" "intangible harms").

[42] *TransUnion*, 594 U.S. at 425; *see also Shields v. Professional Bureau of Collections of Md., Inc.*, 55 F.4th 823, 827 (10th Cir. 2022) (giving reputational harm as example of a concrete intangible harm).

[43] *TransUnion*, 594 U.S. at 432 (quoting *Milkovich v. Lorain Journal Co.*, 497 U.S. 1, 13 (1990)); *Lupia v. Medicredit, Inc.*, 8 F.4th 1184, 1192 (10th Cir. 2021) (describing publication as required element of defamation).

defamation, those false statements must be defamatory, and they must be published. A statement is defamatory when it would impair the plaintiff's reputation—for example, a statement that impairs the plaintiff's reputation for creditworthiness, such as he has "refus[ed] to pay his debts."[44] Publication requires that the statement be communicated to a third party[45] and that the third party "understand the defamatory nature of the communication."[46] But to repeat: to confer standing, the harm need not be "an exact duplicate" of the common-law analogue.[47] Here, then, Brady can establish standing if she shows (1) that Midland Credit's statements were defamatory and (2) that Midland Credit published those statements to third party Experian.

She makes that showing. The undisputed facts show that Midland Credit communicated to Experian the false statement that Brady owed three *undisputed* debts to it, when in fact she had disputed them with Midland Credit. That statement was defamatory because it impaired Brady's reputation for creditworthiness.[48] And drawing all reasonable inferences in Brady's favor, Midland Credit published that statement. First, Midland Credit communicated that statement to Experian—a third party. Second, the record here supports a reasonable inference that Experian understood the defamatory nature of that communication. The record shows that Experian

---

[44] Restatement (Second) of Torts § 569 cmt. g (A.L.I. 1977). *But see Arato v. Nelnet Servicing, LLC*, No. 24-cv-901, 2025 WL 1568036, at *5 (D. Colo. Feb. 24, 2025) (report and recommendation) (finding no analogue to defamatory harm because reporting an inaccurate debt would not "subject [Plaintiff] to hatred, contempt, or ridicule" (internal quotation marks omitted) (quoting *Milkovich v. Lorain Journal Co.*, 497 U.S. 1 (1990))).

[45] Restatement (Second) of Torts § 577 cmt. b (A.L.I. 1977) (clarifying that "defamation primarily protects only the interest in reputation," which cannot be injured "unless the defamatory matter is communicated to a third person").

[46] *Ewing v. MED-1 Sols., LLC*, 24 F.4th 1146, 1154 (7th Cir. 2022).

[47] *TransUnion*, 594 U.S. at 433.

[48] *See Ewing*, 24 F.4th at 1154 (finding that reporting debt as undisputed was concrete harm because it affected "assessment of [the consumers'] creditworthiness"); *Figueroa v. Capital One, N.A.*, No. 23-cv-482, 2024 WL 209058, at *3 (D.N.J. Jan. 19, 2024) (same); Dan B. Dobbs et al., *Dobbs' Law of Torts* § 525 (2d ed. 2011) (recognizing that courts have considered statements defamatory if they "may damage the plaintiff's credit because they bear upon the plaintiff's ability or willingness to pay her debts").

produces credit reports on potential borrowers that include various indicia of creditworthiness.[49] And that fact supports the reasonable inference that Experian does so to permit potential lenders to evaluate the consumer's creditworthiness and that the information it chooses to report is selected because it bears on the consumer's creditworthiness. Here, Midland Credit reported the debt to Experian, and Experian included the undisputed debts in Brady's credit report, which again allows a reasonable inference that Experian reported the undisputed debts because it understood that information was relevant to Brady's creditworthiness. So drawing all reasonable inferences in Brady's favor, Experian understood the defamatory nature of Midland Credit's communication. Midland Credit's false statement to Experian, therefore, was defamatory and was published. So it caused a harm that has a 'close relationship' to defamation—a harm 'traditionally' recognized as providing a basis for a lawsuit in American courts."[50] That intangible harm is a concrete harm sufficient to confer standing on Brady.

Midland Credit disagrees. But neither of its counterarguments carries the day. *First*, Midland Credit argues that a debt collector's publishing inaccurate credit information to a credit-reporting agency cannot confer standing unless the credit-reporting agency in turn publishes the inaccurate information to a potential creditor. Under Midland Credit's theory, Brady suffered a concrete injury only if a potential creditor checked her credit report while it reported the debts as undisputed. But that argument misunderstands the tort of defamation: it requires communication to a third party, not a fourth party (or beyond). And here, Midland Credit communicated the undisputed debt to Experian, a third party, which is all that defamation requires; Brady need not show that Experian then communicated the statement to a potential fourth-party creditor.

---

[49] *See* Doc. 1-3.

[50] *TransUnion*, 594 U.S. at 425 (quoting *Spokeo*, 578 U.S. at 341).

To be sure, the Supreme Court has in other contexts required disclosure to a potential creditor before finding standing.  In *TransUnion*, for example, the Court explained that a plaintiff lacks standing to pursue a claim under the Fair Credit Reporting Act ("FCRA") challenging errors in a credit report if the "inaccuracy in an internal credit file . . . is not disclosed to a third party."[51]  So the Court rejected standing for those plaintiffs "whose internal TransUnion credit files were not disseminated to third-party businesses."[52]  But the claim in those cases arose under the FCRA, which operates differently than the FDCPA.  The FCRA creates a cause of action against the credit-reporting agency itself for errors it includes in a credit report.  So to show publication, *TransUnion* required that the credit-reporting agency communicate the errors to a third party—generally a potential creditor checking the erroneous credit report.  But the Fair Debt Collection Practices Act creates a different cause of action—one against a debt collector, not against a credit-reporting agency.  The relevant third party therefore shifts: the FCRA's cause of action encompasses communications to potential creditors; the FDCPA's cause of action encompasses communications to credit-reporting agencies.[53]  So Midland Credit's reliance on *TransUnion*, which addressed the FCRA, is misplaced.[54]  Instead, to have standing under the

---

[51] *Id.* at 434.

[52] *Id.* at 439.

[53] *See, e.g.*, *Figueroa*, 2024 WL 209058, at *3 ("[D]issemination to a credit reporting agency suffices to establish defamatory publication for standing purposes."); *Everhart v. Credit Vision, Inc.*, No. 20-cv-670, 2023 WL 2607274, at *4 (S.D. Ohio Mar. 23, 2023) (finding standing where plaintiff alleged that "a debt collector . . . disseminated misleading information to a third-party credit reporting agency").

[54] So is its reliance on two other cases, *Campbell v. Portfolio Recovery Assocs., LLC*, No. 21-CV-1322, 2022 WL 657225, at *2 (E.D.N.Y. Mar. 4, 2022) ("[T]he distribution of inaccurate information to a credit reporting agency, as opposed to a potential creditor, similarly does not constitute or cause concrete injury for standing purposes."), and *Grauman v. Equifax Info. Servs., LLC*, 549 F. Supp. 3d 285, 291–292 (E.D.N.Y. 2021) (finding that plaintiff lacked standing because the "inaccurate credit report[] [was] never disseminated").  *Campbell* concluded that a plaintiff lacked standing under the FDCPA because the challenged credit report was never disseminated to a potential creditor.  But it based that conclusion solely on *Grauman*, which addressed standing under the FCRA, not the FDCPA.  For the reasons already explained above, those statues focus on different harms, so that *Grauman* is inapposite and *Campbell* is unpersuasive, given its reliance on *Grauman*.

FDCPA, a plaintiff need not show that the credit-reporting agency in turn communicated the credit report to a fourth-party potential creditor.

*Second*, Midland Credit argues that Experian did not understand the defamatory nature of the statements that Brady had undisputed debts. Midland Credit argues that a third party does not appreciate the defamatory nature of a communication unless the plaintiff shows that the communication actually damaged the plaintiff's reputation in some way.

The Court disagrees. Midland Credit's argument conflates, on the one hand, showing that a third party understood the defamatory nature of the communication, with, on the other hand, showing that the communication actually damaged the plaintiff's reputation in the third party's eyes. Recall what the defamatory nature of Midland Credit's communication was—it defamed her reputation for creditworthiness. There is no doubt that Experian would understand that one's nonpayment of an undisputed debt would affect her reputation for creditworthiness. After all, a reasonable inference exists that Experian chose to report the debt as undisputed precisely because it would affect Brady's reputation for creditworthiness; that's why it included the information in the credit report in the first place. That act alone shows that Experian understood the defamatory nature of the communication—that is, its impairment of Brady's reputation for creditworthiness. Further, Experian eventually marked the debts disputed, again implying that it understood the relevance of the disputed–undisputed distinction to Brady's creditworthiness.

Brady has therefore met the publication element's requirement that the third party understand the defamatory nature of the communication. She need not make a further showing that the communication actually damaged her creditworthiness in Experian's estimation. An example from the Restatement draws out the distinction between these two concepts—

understanding the defamatory nature of the communication, on one hand, and actual damage to the plaintiff's reputation, on the other. In the course of discussing publication, the Restatement gives this example of one who does not understand the defamatory nature of a communication: someone who does not speak the same language as the communication.[55] That example clarifies that the understanding requirement for publication addresses comprehension of the communication's message, not actual damage to the plaintiff's reputation. Indeed, the Restatement explains that "[t]o be defamatory, it is not necessary that the communication actually cause harm to another's reputation or deter third persons from associating or dealing with him."[56]

The Tenth Circuit has not yet ruled on this issue, but Midland Credit cites several Seventh Circuit cases that address FDCPA claims similar to Brady's. Those cases consider, for the purposes of publication, whether the third-party credit-reporting agency altered its own assessment of the plaintiff's creditworthiness before finding standing.[57] In *Wood v. Security Credit Services, LLC*, the court explained that to show publication, the plaintiff needed to establish both that the defendant disseminated the communication to a third party and that the "the third party . . . underst[oo]d the defamatory nature of the communication."[58] The court went

---

[55] *See* Restatement (First) of Torts § 577 cmt. d. (A.L.I. 1938) ("A libel may be published in a foreign language provided it is understood by the person to whom it is communicated."); *id.* at illus. 3 ("In [a foreign language], A accuses B of murder. Neither B nor anyone else understands him. A has not published a slander.").

[56] *Id.* § 559 cmt. d.

[57] *Ewing v. MED-1 Sols., LLC*, 24 F.4th 1146, 1154 (7th Cir. 2022) ("[T]he Consumers submitted evidence that TransUnion's assessment of their creditworthiness took into account whether a debt was disputed or not."); *Wood v. Sec. Credit Servs., LLC*, 126 F.4th 1303, 1310 (7th Cir. 2025) ("[T]he record shows that a debt marked as disputed negatively impacts a credit score less than a debt that is marked as disputed."). Another case from the Seventh Circuit also discusses the requirement that the third party alter its assessment of creditworthiness. *Freeman v. Ocwen Loan Servicing, LLC*, 113 F.4th 701, 709 (7th Cir. 2024) (finding no evidence that third party understood defamatory nature of the communication because it "merely shows that TransUnion included Ocwen's inaccurate reporting in its own credit reports, indicating nothing about TransUnion's or another third party's assessment of her creditworthiness.").

[58] *Wood*, 126 F.4th at 1310 (quoting *Ewing*, 24 F.4th at 1154).

on to note that it is not "a difficult burden [to] establish[] that a credit reporting agency would understand the defamatory significance of inaccurate reporting," but nevertheless, the plaintiff must present some evidence of the credit reporting agency's understanding.[59]  The court concluded that the plaintiff in its case had presented sufficient evidence of third-party understanding: "Equifax included [the plaintiff's] debt on his credit reports, and when [the defendant] ultimately reported a dispute, Equifax included that too," and "the record shows that a debt marked as disputed negatively impacts a credit score less than a debt that is not marked disputed."[60]  The Seventh Circuit in *Ewing v. MED-1 Solutions, LLC* came to a similar conclusion.  The court in that case concluded that a plaintiff brought forth sufficient evidence that TransUnion understood the defamatory significance of a failure to note a debt as disputed because "TransUnion included the debts in the Consumers' credit reports; TransUnion would have included the disputes too had the Debt Collectors communicated them.  And the Consumers submitted evidence that TransUnion's assessment of their creditworthiness took into account whether a debt was disputed or not."[61]  *Freeman v. Ocwen Loan Servicing, LLC* clarified what constitutes sufficient evidence of understanding.  It is not enough, the court explained, that the credit reporting agency "included [the defendant's] inaccurate reporting in its own credit reports" because that fact "indicat[es] nothing about [the credit reporting agency's] or another third party's assessment of [the plaintiff's] creditworthiness."[62]  Instead, the plaintiff needed

---

[59] *Id.*

[60] *Id.*

[61] *Ewing*, 24 F.4th at 1154.

[62] *Freeman*, 113 F.4th at 709–10.

something more: that "its assessment of the plaintiff's creditworthiness considered whether a debt was disputed."[63]

In this Court's judgment, *Freeman* went one step too far by concluding that publication requires evidence that the communication actually affected the third party's assessment of the plaintiff's creditworthiness.  Publication only looks to whether the third party understood the defamatory nature of the communication, not that the communication actually altered the third party's assessment of the plaintiff's reputation.[64]  Of course the fact that a communication actually harmed a plaintiff's reputation with the third party serves as evidence that the third party understood the communication's defamatory significance.  But those are separate issues as far as defamation is concerned—the former bears on damages; the latter bears on publication.  The Court therefore concludes that Brady's evidence that Experian reported the debts as undisputed (and later noted them as disputed) demonstrates that Experian understood the significance of the defamatory significance.

As explained above, Brady has brought forth evidence that supports a finding that Experian understood the defamatory nature of Midland Credit's communications.  So she has satisfied the requirement that Midland Credit publish the defamatory statement.  Brady therefore suffered an intangible harm analogous to defamation—a harm traditionally recognized as giving rise to a lawsuit in American courts.  So Brady has shown that she suffered a concrete harm sufficient to confer standing on her.

---

[63] *Id.*

[64] Indeed, common-law defamation made libel actionable per se, that is, the defamer was "liable to the other although no special harm or loss of reputation results therefore."  *Id.* § 569.  That is because the "publication is itself the injury," independent of the special harm that the publication might cause.  *Id.* § 569 cmt. c.  So, as *TransUnion* itself noted, for libel per se, "publication is generally presumed to cause a harm."  *TransUnion LLC v. Ramirez*, 594 U.S. 413, 437 (2021).

Midland Credit finally argues that Brady has failed to show causation—that its publication of the defamatory statement caused Brady's injury in fact. But here, the injury in fact is the reputational injury she suffered from Midland Credit's publishing a defamatory statement to Experian. So Midland Credit's publication of the defamatory statement necessarily caused the defamatory injury to Brady. The Court therefore finds that Brady has standing to pursue her FDCPA claim.[65]

## B. Violation of § 1692e(8)

Midland Credit moves for summary judgment on its FDCPA claim.[66] Section 1692e(8) imposes liability on any debt collector that "communicat[es] or threaten[s] to communicate to any person credit information which is known or which should be known to be false, including the failure to communicate that a disputed debt is disputed." Brady's exact argument for summary judgment shifts. In her opening brief, she contended that once Midland Credit received the January 2024 letters, it knew that Brady's debts were disputed, so it violated § 1692e(8) by failing to report them as undisputed to Experian.[67] Now in her reply brief, she contends that even if Midland Credit did not know that her debts were disputed, it should have known that they were.

---

[65] Midland Credit asserts that Brady conceded the issue of causation—and thus the Court must find that she lacked standing—because she does not argue the issue in the brief. Midland Credit is right that a plaintiff's failure to respond to a defendant's lack-of-standing argument may result in dismissal. *See RMCO Holdings, LLC v. Golden Trading & Transport, LLC*, No. 22-cv-650, 2023 WL 3815069, at *7 (D. Colo. June 5, 2023) ("[A] plaintiff's failure to respond to a standing challenge generally warrants dismissal of the claims at issue." (collecting cases)). But Brady's briefing is replete with arguments that Midland Credit's conduct "caused the injuries," *see* Doc. 56 at 28, and "resulted in intangible harms to Ms. Brady's credit reputation," *see id.* at 32. That is enough to avoid conceding the argument.

[66] Midland Credit's motion did not move for summary judgment on Brady's claim. Instead, Midland Credit requested summary judgment on the claim only in its reply brief. That argument is waived. *See H&C Animal Health, LLC v. Ceva Animal Health, LLC*, 499 F. Supp. 3d 920, 936 (D. Kan. 2020).

[67] Even if she had stuck with that argument, it would have failed. The record amply demonstrates a genuine dispute of fact on the issue of whether Midland Credit knew (or could have known) that Brady had disputed the debt, given its failure to associate the dispute letters with Brady's accounts.

But either way, those arguments present factual questions appropriate for resolution by the trier of fact. Both parties agree that the statutory language "should have known" equates to a reasonable-duty-of-care standard, so that Brady must show that Midland Credit did not exercise reasonable care when attempting to associate Brady's dispute letters with her accounts. Midland Credit argues that it acted reasonably when it placed the letters in the UFA folder because the letters contained insufficient information to achieve a successful match; Brady argues that the letters contained sufficient information, so that Midland Credit acted unreasonably by failing to associate the letters. But whether the letters contained enough identifying information to successfully associate them with Brady's account is a factual issue best left to the jury. And so is the issue of whether, even if they did contain enough information, it was reasonable for Midland Credit to cease efforts after several attempts to associate the letters. Those genuine factual disputes preclude the Court's granting summary judgment for Brady on her claim.

### C. Bona Fide Error Defense

Both Brady and Midland Credit seek summary judgment on Midland Credit's bona fide error defense. That defense "insulates debt collectors from liability even when they have violated the FDCPA."[68] Under § 1692k(c), a debt collector is immune from liability if "the debt collector shows by a preponderance of evidence that the violation was not intentional and resulted from a bona fide error notwithstanding the maintenance of procedures reasonably adapted to avoid any such error."[69] Here, then, Midland Credit must show that its § 1692e(8) violation was "(1) unintentional, (2) a bona fide error, and (3) made despite procedures reasonably adapted to avoid the violation."[70] The first element is a question of subjective intent

---

[68] *Johnson v. Riddle*, 443 F.3d 723, 727 (10th Cir. 2006).

[69] 15 U.S.C. § 1692k(c).

[70] *Lupia v. Medicredit, Inc.*, 8 F.4th 1184, 1195 (10th Cir. 2021).

and requires that the defendant lack the "specific intent to violate the Act."[71]  But being a question of subjective intent, satisfying the first element will often rely on inferential evidence from a defendant's objective acts.  Those objective acts are addressed by the second and third elements, which are both objective elements.[72]

The second element "impose[s] an objective standard of reasonableness upon the asserted unintentional violation,"[73] and the third element breaks down into two components: (1) "whether the debt collector 'maintained'—*i.e.*, actually employed or implemented—procedures to avoid errors" and (2) "whether the procedures were 'reasonably adapted' to avoid the specific error at issue."[74]  The Supreme Court has explained that "procedures" are "processes that have mechanical or other such 'regular orderly' steps to avoid mistakes."[75]  The procedures need not be perfect; they need only be reasonable.[76]

The violation here is that Midland Credit reported Brady's debt as undisputed even though she had disputed it.  So to prevail on its affirmative defense, Midland Credit must show that reporting the debt as undisputed was a bona fide error.  But even assuming that Midland Credit has satisfied the first and second elements, the Court concludes that genuine disputes of material fact remain as to the third element.

---

[71] *Johnson*, 443 F.3d at 728.

[72] *See id.* at 728–29 ("[T]he extent to which [the defendant] should have objectively realized that his actions were in violation of law may be inferentially probative of the subjective intentional nature of that violation.  We therefore immediately turn to the objective analysis required by the second and third prongs of the bona fide error defense.").

[73] *Johnson*, 443 F.3d at 729.

[74] *Lupia*, 8 F.4th at 1195–96 (internal quotation marks omitted) (quoting *Johnson*, 443 F.3d at 729).

[75] *Jerman v. Carlisle, McNellie, Rini, Kramer & Ulrich LPA*, 559 U.S. 573, 587 (2010).

[76] *Neeley v. Express Recovery Servs.*, No. 10CV604, 2012 WL 1641198, at *2 (D. Utah May 9, 2012) ("The Defendant is not required to show the policies and procedures were perfect, only that they show reasonable precaution." (citing *Kort v. Diversified Collection Serv., Inc.*, 394 F.3d 530, 539 (7th Cir. 2005))).

First, a genuine fact issue remains as to what procedures Midland Credit actually employed to prevent the error here. Midland Credit's corporate representative testified about the procedures that Midland Credit generally uses to associate dispute letters to accounts. She explained several steps in the associating process. First, a team member looks for an account number in the letter. And then, if the team member does not find one, she attempts to use other information in the letter to associate it with an account—information like the consumer's name, Social Security number, full or partial address, original account number, or phone number. The team member may also perform a wild-card search—that is, a search that looks for matches that begin with the same letters but uses asterisks to indicate that some letters may be different.[77] She did not testify, however, to other procedures that Midland Credit might use. Midland Credit's associating guidelines explain that if a team member still cannot associate an account, she can use a different database—Salesforce—to search for a match.[78] Moreover, if that tactic is fruitless, then the account manager must "look for any possible matches with any other additional information, such as the name and balance of the original creditor."[79] But if a match remains unavailing even after those steps, then the account manager will place the dispute letter in a separate folder, designated "Unable to Find Account"—UFA. Finally, once the letter is placed in the UFA, other account managers will run through the same process again—attempting to associate the letter with an account—for the next seven days. But if the team still cannot associate the letter to an account, then it ends its efforts; the letter remains in the UFA folder indefinitely.

---

[77] An example: "Fierro*" would return a match for "FierroSr." Doc. 37-2, Canez Dep., 42:1–42:12.

[78] Doc. 46 at 4.

[79] *Id.* at 7.

Although Canez explained what Midland Credit's general procedures are, the bona fide error defense considers what procedures were actually used to prevent the error at issue. Canez's testimony supports a reasonable inference that Midland Credit employees followed at least some procedures. She explained that several employees had left their initials in the file name indicating that they had tried—but failed—to associate the letters with an account.[80] But the file naming convention says little about what procedures the employees actually followed; at best, it implies that they made some attempt to associate the letters. Moreover, Canez gave only general testimony about what steps the employees actually took: "they followed the procedure guidelines when handling those incoming letters."[81] But she did not explain the specific steps the account managers took. And, in fact, when asked about whether they performed a wild-card search— which the guidelines permit but do not require—she "assume[d]" so because such a search is "pretty standard," but "ha[d] no evidence that it was used" to associate Brady's letters to her account. Nor did she specify whether the account managers used Salesforce to try to associate the letters with an account. That testimony permits ambivalent inferences about what procedures Midland Credit actually followed and implemented—regardless of Midland Credit's general guidelines—creating a genuine factual dispute precluding summary judgment.

Second, even setting that fact issue aside, a genuine dispute of fact exists about whether those procedures were reasonably adapted to ensure that Midland Credit would not report a disputed debt as undisputed. The reasonableness of an action is a question of fact that is not generally appropriate to decide on summary judgment.[82] And the evidence submitted here is

---

[80] Doc. 37-2, Canez Dep. 83:20–84:12.

[81] *Id.* at 17:12–17:15.

[82] *See Ouro Mining, Inc. v. Clemmer*, No. CIV-20-157, 2023 WL 2742734, at *5 n.13 (E.D. Okla. Mar. 31, 2023).

susceptible of reasonable inferences that would permit a reasonable trier of fact to find for either Brady or Midland Credit.  For example, though a debt collector need only adopt reasonable procedures—not every conceivable procedure—a fact issue remains about whether reasonable procedures would have made mandatory the wild-card search and the search on Salesforce. Midland Credit offered testimony that employing those procedures here would have been impracticable and thus unreasonable.  Brady contends otherwise.  Those facts are enough to create a genuine dispute of fact as to whether the procedures were reasonably adapted to preventing Midland Credit from erroneously reporting a disputed debt as undisputed.  Either way, that dispute is appropriately resolved by the fact finder, not by the Court at summary judgment.  Because the record supports reasonable inferences that would permit a jury to find for either party on this issue, a genuine issue of fact remains on Midland Credit's bona fide error defense.

## IV.  Conclusion

The Court denies both parties' motions for summary judgement.  Brady has shown that she suffered a concrete injury in fact and that Midland Credit's conduct caused it; she therefore has standing to pursue her claim.  But genuine disputes of material fact remain both on her claim and on Midland Credit's bona fide error defense.  Neither party is therefore entitled to summary judgment.

**IT IS THEREFORE ORDERED BY THE COURT** that Midland Credit's Motion for Summary Judgment (Doc. 35) is **denied,** and Brady's Motion for Summary Judgment (Doc. 38) is **denied**.

**IT IS SO ORDERED.**

Dated: July 29, 2025

S/ Julie A. Robinson
JULIE A. ROBINSON
UNITED STATES DISTRICT JUDGE